736 June 16, 2016 No. 39

IN THE SUPREME COURT OF THE
STATE OF OREGON

In the Matter of the Compensation of
Rebecca M. Muliro, Claimant.

DEPARTMENT OF CONSUMER
AND BUSINESS SERVICES,
Workers' Compensation Division;
and ComPro, Inc.,
*Respondents on Review,*

*v.*

Rebecca M. MULIRO,
*Petitioner on Review,*

*and*

LIBERTY NORTHWEST
INSURANCE CORPORATION;
Adams & Gray Home Care - Marquis Home Health;
and Assured at Home,
*Respondents.*

(WCB 103496, 1102720; CA A152594; SC S062922)

En Banc

On review from the Court of Appeals.*

Submitted on the record on January 12, 2016.

R. Adian Martin, Portland, filed the brief for petitioner on review.

Greg Rios, Assistant Attorney General, Salem, filed the brief for respondent on review. With him on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

NAKAMOTO, J.

The decision of the Court of Appeals is affirmed. The order of the Workers' Compensation Board is reversed, and the case is remanded to the board for further proceedings.

_____

* Review from Workers' Compensation Board. 267 Or App 526, 341 P3d 131 (2014).

**NAKAMOTO, J.**

Under the Workers' Compensation Act, an injured worker with more than one employer may be entitled to receive supplemental temporary disability benefits from the Workers' Benefit Fund, in addition to the disability benefits the worker receives from the employer's insurer. The injured worker cannot qualify "unless the insurer *** receives," within 30 days of receipt of an initial claim, "notice that the worker was employed in more than one job" at the time of injury. ORS 656.210(2)(b)(A). The question in this case is whether an injured worker must provide actual notice of the worker's secondary employment in connection with the claims process or whether the employer's preexisting knowledge of that employment may be imputed to the insurer to satisfy the notice requirement of ORS 656.210(2)(b)(A). We hold that the correct interpretation of ORS 656.210(2)(b)(A) requires a claimant to prove that the insurer received actual notice of the claimant's secondary employment within 30 days of the insurer's receipt of the initial claim.

## I.   BACKGROUND

We take the historical facts, which are undisputed, from the findings of the Workers' Compensation Board in its order on review. While claimant was employed by Adams & Gray Home Care-Marquis Home Health (Adams & Gray) as a certified nursing assistant, she sustained a workplace injury.

At that time, claimant also worked for two other home health employers, and Adams & Gray was aware of that fact. Two coordinators at Adams & Gray responsible for scheduling claimant's work hours, claimant's supervisors, knew of her secondary employment because claimant would at various times let a supervisor know, when asked to handle a placement, that she was already scheduled by another agency.

Claimant promptly sought workers' compensation benefits for her injury. She filed a workers' compensation claim, which Adams & Gray's insurer, Liberty Northwest Insurance Corporation (Liberty), received less than a week

later. As part of her claim, claimant filled out and signed several workers' compensation benefits forms that were submitted to Liberty—a Liberty claim form (Form 801) and a Department of Consumer and Business Services (DCBS) "Worker's and Physician's Report for Workers' Compensation Claims" form (Form 827). On each form, there was a box above the signature line labeled either "Check here if you are employed w/more than one employer" or "Check here if you have more than one employer." Claimant did not check the boxes on those forms that would have indicated that she had more than one employer. Form 801 contained Liberty's mailing address, telephone number, and fax number, and Form 827 provided a telephone number to call in case the claimant did not "know the name and address of the insurer."

Claimant gave a recorded statement to a claims investigator less than two weeks after she had filed her claim. Claimant told the investigator that Adams & Gray usually gave her 40 hours of work per week. The investigator did not ask claimant whether she had other employers while working for Adams & Gray, and claimant did not volunteer that information. Within 30 days of filing her claim, neither claimant nor Adams & Gray had informed Liberty that claimant had secondary employment, and Liberty was unaware of that fact.

Approximately nine months after her injury, claimant informed Liberty through counsel that she had had multiple employers at the time of her injury and requested supplemental temporary disability benefits. Liberty elected not to process the claim for supplemental disability benefits, so DCBS, through its assigned processing administrator, ComPro, Inc., did so.[1] ComPro denied claimant's request on the ground that claimant was ineligible for those benefits because Liberty had not received timely notice of claimant's secondary employment, as required by ORS 656.210(2)(b)(A).

---

[1] If an insurer elects to transfer responsibility to process and pay supplemental disability benefits, DCBS will "administer and pay the supplemental benefits directly or shall assign responsibility to administer and process the payment to a paying agent selected by the director." ORS 656.210(5)(b); OAR 436-060-0035(1)(a). In that event, ComPro acts as assigned administrator for supplemental disability benefits on behalf of DCBS.

Subsequently, claimant requested a hearing before the board's Hearings Division. Based on Adams & Gray's knowledge of claimant's secondary employment and the reasoning of an earlier board decision, the administrative law judge (ALJ) concluded that Liberty had received timely notice of claimant's secondary employment. The ALJ determined that claimant was eligible for supplemental disability benefits and ordered ComPro to process claimant's claim. DCBS and ComPro sought board review of that decision, and the board affirmed the ALJ's order. The board concluded that "the 'notice' requirement of ORS 656.210(2)(b)(A) has been met when the employer receives information regarding secondary employment."

The board acknowledged that the express language of the statute provides that notice must be received by the "insurer" and that an "employer (unless it is self-insured) has no express statutory obligation to pass information/ knowledge to its insurer or statutory administrator, and no responsibilities under the Director's rules for processing supplemental disability claims." But, the board stated that it is "well settled that, with respect to the processing of claims, notice provided by a claimant to an insured employer may be imputed to the insurer." According to the board, even if claimant had the burden to provide notice of secondary employment, "[c]laimant *did* provide the information, albeit to [Adams & Gray]," and the "issue of whether [the required] information should be imputed from [Adams & Gray] to [Liberty] is a matter distinct from the express statutory language." (Footnote omitted; emphasis in original.) As support, the board cited three Court of Appeals cases "dealing with 'imputation' between an employer and its insurer": *Anfilofieff v. SAIF*, 52 Or App 127, 627 P2d 1274 (1981); *Nix v. SAIF*, 80 Or App 656, 723 P2d 366, *rev den*, 302 Or 158 (1986); and *SAIF v. Abbott*, 103 Or App 49, 796 P2d 378 (1990), *modified on recons*, 107 Or App 53, 810 P2d 878 (1991). Underlying the board's decision was its concern that it should not interpret the statutory scheme in a way that "would allow an employer to nullify a supplemental disability claim by simply refraining from forwarding otherwise timely received supplemental disability information to its insurer."

DCBS, with Liberty and Adams & Gray joining, sought judicial review in the Court of Appeals. DCBS argued that, under the express terms of ORS 656.210(2)(b)(A), what a claimant must provide, and the insurer must receive, is "actual notice." The Court of Appeals agreed that ORS 656.210(2)(b)(A) identifies who must receive notice and makes no provision for any type of notice other than actual notice. *DCBS v. Muliro*, 267 Or App 526, 536, 341 P3d 131 (2014). The Court of Appeals also noted that the director of DCBS had adopted an agency rule to implement the provisions of ORS 656.210(2)(b) that was consistent with its reading of the statute. That rule, OAR 436-060-0035(6), is not challenged in this case and augments ORS 656.210(2)(b) by expressly stating that the injured worker must provide notice to the insurer. The Court of Appeals determined that *Anfilofieff, Nix*, and *Abbott* did not "provide helpful context for an interpretation of the notice requirement in ORS 656.210(2)(b)(A)." *Muliro*, 267 Or App at 535. Instead, the court considered its reasoning in *Valencia v. GEP BTL, LLC*, 247 Or App 115, 269 P3d 65 (2011), to be instructive. Relying on that case, the Court of Appeals determined that "an injured worker seeking supplemental disability has the burden of satisfying the requirements of ORS 656.210(2)(b); when the worker does not provide the necessary information, the entity responsible for processing the claim is not obligated to independently seek that information out." *Muliro*, 267 Or App at 536. As a result, the Court of Appeals rejected claimant's contention that Adams & Gray's knowledge of claimant's secondary employment should be imputed to Liberty.

Claimant petitioned for review in this court, challenging the conclusion that ORS 656.210(2)(b)(A) requires a claimant to provide, and the insurer to receive, actual notice of secondary employment. We allowed review to address the interpretation of ORS 656.210(2)(b)(A).

## II.   ANALYSIS

The issue presented involves statutory construction, which we resolve by applying familiar principles set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or

160, 171-72, 206 P3d 1042 (2009). We attempt to discern the meaning of the statute most likely intended by the legislature that enacted it, examining the text in context, any relevant legislative history, and pertinent rules of interpretation. *Gaines*, 346 Or at 171-72.

Determining the intended meaning of a statute is a question of law. *Bergerson v. Salem-Keizer School District*, 341 Or 401, 411, 144 P3d 918 (2006). But, depending on the nature of the statutory terms at issue, an administrative agency's construction of a statute nevertheless may be entitled to a measure of deference. *See generally Springfield Education Assn. v. School Dist.*, 290 Or 217, 223, 621 P2d 547 (1980) (summarizing the categorization of statutory terms). Whether the agency's construction is entitled to such deference depends on whether the disputed term is exact, inexact, or delegative. *Id.* Whether legislation is exact, inexact, or delegative is itself a question of statutory construction, requiring us to examine the text of the statute in its context. *J. R. Simplot Co. v. Dept. of Agriculture*, 340 Or 188, 197-98, 131 P3d 162 (2006). As explained below, this case involves inexact terms, and, in those types of cases, we examine the meaning of the statute without deference to the agency's construction.

A.   *Supplemental Disability Benefits and the Statute*

We begin our analysis with an overview of the supplemental temporary disability benefits and the statute at issue. The Workers' Benefit Fund (the Fund) pays for special benefits designed to promote full employment and compensation to injured workers. OAR 411-031-0040 (10)(c)(B). The Fund is created in the State Treasury, separate and distinct from the General Fund, and is primarily funded by employer assessments, noncomplying employer recoveries, and civil penalties. ORS 656.605(1); *see* ORS 656.054; ORS 656.506; ORS 656.735. Assessments collected for the Fund are computed yearly to meet its needs. ORS 656.506(4). Development of the assessment rate takes into consideration estimates of annual fund expenditures and revenues, annual hours worked per employee, the number of employees covered by workers' compensation insurance, and the Fund balance requirements. OAR 436-070-0010(2). The Fund is "appropriated continuously" to the director of

DCBS "to carry out the activities for which the fund may be expended." ORS 656.605(3). And the director of DCBS has the authority to distribute funds, as well as to increase assessments or lower benefits when needed. ORS 656.605(3) - (4); ORS 656.506.

One of the special benefits that is paid out of the Fund is the replacement of lost wages for the injured worker's *secondary* employment—that is, multiple-employer supplementary temporary total disability benefits (also known as "supplemental temporary disability benefits," "supplemental disability benefits," or "supplemental disability"). *See* ORS 656.210(5); ORS 656.605(2)(d); OAR 436-060-0035(1)(e); OAR 436-060-0500. The cost of administering those benefits is also paid out of the Fund. ORS 656.210(5); ORS 656.605(2)(d).

Temporary total disability compensation is typically based on wages from a single employer. Under ORS 656.210(1), an injured worker can receive temporary total disability compensation in an amount based on the worker's wages.[2] If the worker has "one job at the time of injury," the amount of compensation is based on the worker's weekly wage from that one job. ORS 656.210(2)(a)(A).

But, if the worker has "more than one job at the time of injury," the amount of compensation can be based on "all earnings the worker was receiving from all subject employment." ORS 656.210(2)(a)(B). The statute in dispute, ORS 656.210(2)(b)(A), sets out one of the requirements for an injured worker to become eligible for the supplemental temporary disability benefits paid out of the Fund.

An injured worker is not entitled to supplemental disability

"unless the *insurer*, self-insured employer or assigned claims agent for a noncomplying employer *receives*:

---

[2]  ORS 656.210(1) provides, in part:

"When the total disability is only temporary, the worker shall receive during the period of that total disability compensation equal to 66-2/3 percent of wages, but not more than 133 percent of the average weekly wage nor less than the amount of 90 percent of wages a week or the amount of $50 a week, whichever amount is less."

"(A)   *Within 30 days of receipt of the initial claim, notice* that the worker was employed in more than one job with a subject employer at the time of injury; and

"(B)   Within 60 days of the date of mailing a request for verification, verifiable documentation of wages from such additional employment."

ORS 656.210(2)(b) (emphases added). Thus, ORS 656.210(2)(b) provides that an injured worker is ineligible for supplemental disability benefits unless the employer's insurer receives two items, each within a required time period: (1) notice of the injured worker's secondary employment within 30 days of the "receipt of the initial claim" under subparagraph (A) and (2) "verifiable documentation of wages" of that additional employment within 60 days from when the insurer requests the documentation under subparagraph (B).

Subparagraph (A) is silent as to whether the worker or the employer is responsible for providing notice of the injured worker's secondary employment to the insurer. However, DCBS's rule, OAR 436-060-0035(6)(b), states that an injured worker is eligible for supplemental disability benefits if "[t]he worker provides notification of a secondary job to the insurer within 30 days of the insurer's receipt of the initial claim[.]" DCBS's rule expressly places the burden of providing the notice on the worker. That rule also requires a worker to provide notice within a specific timeframe, namely, within 30 days of the insurer's receipt of the initial claim.

B.   *Text and Context of ORS 656.210(2)(b)(A)*

On review, claimant reprises the arguments she made before the Court of Appeals. The gravamen of claimant's position is that an insured employer's knowledge of an injured worker's secondary employment at the time of her injury—regardless of how or when that knowledge was acquired—is imputed to the employer's insurer for purposes of ORS 656.210(2)(b)(A). Claimant does not dispute that the text of ORS 656.210(2)(b)(A) appears to require that the insurer receive actual notice of an injured worker's secondary employment. She instead draws our attention to (1) "context," which, according to claimant, includes the surrounding workers' compensation statutes, common law principles of agency, and Oregon case law, and (2) the

legislative history of the statute. We conclude that the text of ORS 656.210(2)(b)(A), in context, is dispositive.

We turn first to the text of ORS 656.210(2)(b) to determine the meaning of the disputed words "receive" and "notice." In construing those two words, we pay careful attention to "the exact wording of the statute." *State v. Vasquez-Rubio*, 323 Or 275, 280, 917 P2d 494 (1996). We do so because only that wording received the consideration and approval of a majority of the members of the Legislative Assembly. *OR-OSHA v. CBI Services, Inc.*, 356 Or 577, 588, 341 P3d 701 (2014). As we explained in *Gaines*, that formal adoption process produces "the best source from which to discern the legislature's intent, for it is not the intent of individual legislators that governs, but the intent of the legislature as formally enacted into law." 346 Or at 171.

As mentioned, to determine the meaning of the terms in the phrase "receives *** notice" as it is used in ORS 656.210(2)(b) and subparagraph (A), we must ascertain whether they are exact, inexact, or delegative in nature, so that we may apply the appropriate standard of review. In this case, we swiftly conclude that the statutory phrase "receives *** notice" contains inexact terms: Neither term is so precise that no interpretation is necessary (as to require only factfinding), as is the case for exact terms. Nor does the phrase indicate that the legislature intended to delegate the determination of its meaning to an agency charged with implementing the statute, such as the term "good cause," an open-ended phrase that necessitates further administrative agency policymaking. *See Springfield Education Assn.*, 290 Or at 223; *see also Bergerson*, 341 Or at 411 (inexact terms "express a complete legislative meaning but with less precision"). For that reason, we examine the meaning of ORS 656.210(2)(b)(A) without deference to DCBS's construction. *Blachana, LLC v. Bureau of Labor and Industries*, 354 Or 676, 687, 318 P3d 735 (2014) (agency's interpretation of non-delegative term "is not entitled to deference on review").

Because the statute does not define the disputed terms, our task is to determine the intended meaning of "receives *** notice," applying the ordinary tools of statutory construction. When the legislature has not defined a

word or a phrase, we assume, at least initially, that the word or phrase has its "plain, natural, and ordinary" meaning. *PGE*, 317 Or at 611. We frequently consult dictionary definitions of the terms, on the assumption that, if the legislature did not give the term a specialized definition, the dictionary definition reflects the meaning that the legislature would naturally have intended. *State v. Murray*, 340 Or 599, 604, 136 P3d 10 (2006). But, when the legislature uses technical terminology, that is, "terms of art" that are "drawn from a specialized trade or field[,]" courts "look to the meaning and usage of those terms in the discipline from which the legislature borrowed them." *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014). When "a term is a legal one, we look to its 'established legal meaning' as revealed by, for starters at least, legal dictionaries." *Id*. We do not, however, interpret statutes solely on the basis of dictionary definitions. *State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011). Instead, we examine word usage in context to determine which among competing definitions is the one that the legislature more likely intended. *State v. Fries*, 344 Or 541, 547-48, 185 P3d 453 (2008) (context determines which of multiple definitions is the one the legislature intended).

We begin with the ordinary meaning of the word "receive." "Receive" is defined as "to take possession or delivery of * * * <~ a letter>." *Webster's Third New Int'l Dictionary* 1894 (unabridged ed 2002). Similarly, *The American Heritage Dictionary of the English Language* 1467 (5th ed 2011) defines "receive" as "1a. To take or acquire (something given or offered); get or be given: *receive a present*. b. To be the person who gets (something sent or transmitted): *receive an email*." (Emphases in original.) Thus, in ordinary usage, the word "receive" connotes a person getting something sent or transmitted to him or her. The same is true in legal usage. *See Black's Law Dictionary* 1460 (10th ed 2014) (to receive means "[t]o take (something offered, given, sent, etc.); to come into possession of or get from some outside source <to receive presents>").

The ordinary meaning of the word "notice" can vary from its usage as a legal term of art. *Webster's*, for example, defines "notice" as "a communication of intelligence or of a claim or demand often required by statute or contract and

prescribing the manner or form of giving it[.]" *Webster's* at 1544. Similarly, *The American Heritage Dictionary of the English Language* 1206 (5th ed 2011) defines "notice" as

"3. A written or printed announcement*: a notice of sale*. 4a. A formal announcement, notification, or warning, especially an announcement of one's intention to withdraw from an agreement or leave a job: *gave my employer two weeks' notice; raised the price without notice*. b. The condition of being formally warned or notified: *put us on notice for chronic lateness*."

(Emphases in original.) Thus, in ordinary usage, "notice" requires or connotes some form of communication. *See [Wright v. Turner](), 354 Or 815, 827, 322 P3d 476 (2014)* (undefined terms are assumed to have ordinary meanings).

"Notice," however, can include constructive or imputed knowledge of a fact when used as a legal term of art. For example, *Black's* defines "notice" as

"1.  Legal notification required by law or agreement, or imparted by operation of law as a result of some fact (such as the recording of an instrument); definite legal cognizance, actual or constructive, of an existing right or title ***. A person has notice of a fact or condition if that person (1) has actual knowledge of it; (2) has received information about it; (3) has reason to know about it; (4) knows about a related fact; or (5) is considered as having been able to ascertain it by checking an official filing or recording.

"2.  The condition of being so notified, whether or not actual awareness exists[.]"

*Black's* at 1227. Thus, the ordinary meaning of "notice" does not necessarily apply to that word as it is used in ORS 656.210(2)(b)(A).

Claimant's position is consistent with "notice" being used in the statute as a legal term that encompasses imputed notice. In our view, however, the legislature's use of the term "receives" cuts against claimant's proposed interpretation, which permits the knowledge of claimant's other employment by supervisors who scheduled her work at Adams & Gray to be imputed to Liberty to satisfy the requirement in ORS 656.210(2)(b)(A). That is because imputed notice, by definition, is not "received" by the party to whom it is

imputed. Instead, imputed notice is "[i]nformation *attributed* to a person." *Black's* at 1228 (defining "imputed notice" as "[i]nformation attributed to a person whose agent, having received actual notice of the information, has a duty to disclose it to that person") (emphasis added). If Adams & Gray's preexisting knowledge of claimant's secondary employment, unconnected to the claims process, is attributed to Liberty, Liberty would not actually be receiving, that is, taking possession or delivery of, that information.

In several ways, the context of ORS 656.210(2)(b)(A) confirms that the legislature intended that an insurer must receive actual notice of an injured worker's secondary employment. First, the larger scheme of ORS 656.210(2)(b) provides contextual evidence that supports that reading. *See Force v. Dept. of Rev.*, 350 Or 179, 188, 252 P3d 306 (2011) (explaining that statutory context includes "other parts of the statute at issue"). The statute plainly indicates who must receive notice: an "insurer," a "self-insured employer" or an "assigned claims agent for a noncomplying employer." ORS 656.210(2)(b). An "employer," *i.e.*, a person or entity "who contracts to pay a remuneration for and secures the right to direct and control the services of any person," ORS 656.005(13)(a), such as Adams & Gray, is not listed. Instead, under ORS 656.210(2)(b), notice of secondary employment must be given directly to an employer only when the employer is a "self-insured employer." Unlike Adams & Gray, a "self-insured employer" is an employer who "directly assumes the responsibility for providing compensation due subject workers and their beneficiaries under [the workers' compensation statutes]," ORS 656.403(1), and must comply with specified statutory criteria to maintain "self-insured" status, ORS 656.005(25). Because the legislature has specified that notice of a claimant's secondary employment be given to the insurer, an assigned claims agent, or a self-insured employer, the preexisting knowledge of the claimant's secondary employment of an employer like Adams & Gray does not appear to be relevant to whether the claimant may receive supplemental disability benefits.

The timeframe specified for notice in the statute lends additional support. For a claimant to be eligible for supplemental disability benefits, the legislature has

specified prompt notice of a claimant's secondary employment: notice must be given to the designated entity "[w]ithin 30 days of receipt of the initial claim." ORS 656.210(2)(b)(A). The statute plainly establishes a timeframe during which that information must be received by the designated entity for a claimant to establish a supplemental disability claim, and that timeframe is tied to the injured worker's initial claim. That timeframe suggests that the required notice to the insurer is part of the supplemental disability benefits claims process. Put simply, to be eligible for the benefits, a claimant bears responsibility for the insurer's receipt of information relating to her secondary employment within a 30-day window.

Claimant's view of ORS 656.210(2)(b), though, does not take into account the timing of notice and the apparent connection between notice of secondary employment and the claimant's initiation of a workers' compensation claim described in the statute. In this case, the fact that two supervisors at Adams & Gray had earlier become aware that claimant had secondary employment was not, as a factual matter, connected to claimant's filing of her initial workers' compensation claim. In other words, at no point within the 30-day window did claimant provide that information to Liberty, and neither did she provide the information to Adams & Gray in connection with her initial workers' compensation claim. In the absence of such a connection, claimant's contention that there was imputed notice to Liberty by virtue of knowledge that Adams & Gray obtained at some unknown earlier point disregards the timing requirement of the statute. Claimant's position leads to the conclusion that the timing of Adams & Gray's receipt of notice does not matter, which seems contrary to the timing requirement in the statute.

Although claimant acknowledges that the text of ORS 656.210(2)(b)(A) favors the reading of it urged by DCBS and ComPro, she maintains that the board's reading of ORS 656.210(2)(b)(A) is the better one based on a contextual argument. As context, claimant relies on an employer's general duty to assist its insurer to process claims under the workers' compensation statutes, case law attributing misconduct by an employer and imputing knowledge of an

employer to a workers' compensation insurer in other contexts, and principles of agency law. Claimant's contextual argument, though, fails to persuasively validate the board's reading of ORS 656.210(2)(b)(A).

Claimant employs two statutory provisions, ORS 656.017(1) and ORS 656.262(1), to argue that an employer's knowledge of an injured worker's secondary employment should be imputed to the employer's insurer under ORS 656.210(2)(b)(A) based on an employer's duty to process claims. The first of those, ORS 656.017(1), provides:

"(1)   Every employer subject to this chapter shall maintain assurance with the Director of the Department of Consumer and Business Services that subject workers of the employer and their beneficiaries will receive compensation for compensable injuries as provided by this chapter and that *the employer will perform all duties and pay other obligations required under this chapter*, by qualifying:

"(a)   As a carrier-insured employer; or

"(b)   As a self-insured employer as provided by ORS 656.407."

(Emphasis added.) Claimant focuses on the emphasized part of the provision, contending that ORS 656.017(1) imposes a duty on an employer to perform all duties required under the workers' compensation statutes. But even if claimant's reading of the provision is correct—and ORS 656.017(1) is not directed to some other purpose, such as a requirement that the subject employer either obtain workers' compensation insurance or else provide workers' compensation as a self-insured employer—the provision begs the question whether an employer like Adams & Gray was obliged to perform any duty relating to notice of secondary employment.

In that regard, claimant notes that an employer has a general obligation to assist its insurer pursuant to a second statute, ORS 656.262(1): "All employers shall assist their insurers in processing claims as required in this chapter." The statute does not define "processing." And, because we assume that the legislature intended to use that word in its ordinary sense, we resort to dictionary definitions to give that word its plain, natural, and ordinary meaning. "Processing" means "to subject to rapid examination

and handling designed to dispose of routine details" or "to take care of, attend to, or dispose of by some largely routine procedure <quickly ~*ed* the loan request by the firm>." *Webster's* at 1808 (emphasis in original). Thus, an employer assists its insurers in processing claims by promptly examining and handling claims by "some largely routine procedure." For purposes of ORS chapter 656, a "claim" is "a written request for compensation from a subject worker or someone on the worker's behalf, or any compensable injury of which a subject employer has notice or knowledge."[3] ORS 656.005(6). "Compensation" includes "*all benefits*, including medical services, provided for a compensable injury to a subject worker or the worker's beneficiaries by an insurer or self-insured employer pursuant to [chapter 656]." ORS 656.005(8) (emphasis added). Thus, by definition, a compensable injury may result in a multi-faceted initial claim, *i.e.*, the first or original work injury claim and, depending on the circumstances, other related claims, or sub-claims, for benefits such as the supplemental disability benefits at issue.[4]

We are persuaded that an employer has a duty under ORS 656.262(1) to assist its insurer in processing claims for supplemental disability benefits. Nevertheless, in light of the text of ORS 656.210(2)(b)(A) and its context, as discussed above, we are unpersuaded that the legislature intended that any knowledge by the employer of a claimant's secondary employment, no matter how unconnected that knowledge is to the claims process, must be imputed to the employer's insurer.

Claimant's two other contextual arguments lack merit. None of the three Court of Appeals decisions on which claimant and the board have relied sheds light on the proper interpretation of ORS 656.210(2)(b)(A) given the facts

---

[3] ORS 656.003 provides that, "[e]xcept where the context otherwise requires, the definitions given in this chapter govern its construction."

[4] "At one and the same time an injury can (and often does) give rise to compensation 'claims' for *** temporary total disability (ORS 656.210)[.]" *Ohlig v. FMC Marine & Rail Equipment*, 291 Or 586, 599-600, 633 P2d 1279 (1981) (Peterson, J., dissenting). Therefore, the word "claim" as used in chapter 656, "illustrates the fact that although but one claim is made in the sense that but one request for compensation is made under ORS chapter 656, the relief requested may involve claims of many different kinds." *Id.* at 600.

presented in this case. In *Anfilofieff* and *Nix*, the reasoning the Court of Appeals employed reveals a basic formula: unreasonable conduct by an employer designed to impede the claims process plus an employer's obligation to process claims equals attribution of the employer's misconduct to its insurer in certain circumstances. We do not decide the validity of that formula, and we do not consider its applicability to this case, because claimant does not advance that argument, nor could she. Employer misconduct is absent from this case: Adams & Gray promptly forwarded to Liberty claims-related forms that claimant had herself completed without checking boxes to indicate that she had other employers at the time of her injury. The third case, *Abbott*, arose in a different context and does not assist in the resolution of the question in this case: whether the employer's preexisting knowledge of claimant's secondary employment was sufficient to satisfy a specific notice requirement in ORS 656.210(2)(b)(A).

And, claimant's argument based on agency law rests on an incorrect legal principle. Liberty, claimant notes, is an agent of Adams & Gray. Claimant next asserts that, as the result of "inverse imputation," the knowledge of Adams & Gray, the principal, was imputed to Liberty, the agent. Claimant cites no authority for her novel theory, and we know of no court that has recognized "inverse imputation" as a principle of agency law. Knowledge of an agent is imputed to the principal, not the other way around. Under the common law of agency, it is presumed that an agent always communicates to the principal all information that it should communicate within the scope of the agency, "although the agent does not, in fact, inform his principal thereof." *Hogan v. Alum. Lock Shingle Corp.*, 214 Or 218, 228, 329 P2d 271 (1958). Thus, "notice to an agent is notice to his principal." *State Farm Fire v. Sevier*, 272 Or 278, 288, 537 P2d 88 (1975).

In sum, the text of ORS 656.210(2)(b)(A) and the context of that provision indicate that the legislature intended an injured worker seeking supplemental disability benefits to bear the burden of providing notice of secondary employment to the employer's insurer. An injured worker's obligation can be met in multiple ways, including by the

worker providing the information (such as by delivering a completed claim form) directly to the insurer or to his or her employer, who, because of a statutory claims processing obligation, must transmit that information to its insurer. In either of those scenarios, notice will not be imputed; the insurer will receive actual notice.

C.  *Legislative History*

The parties also urge us to consider the legislative history of ORS 656.210(2)(b)(A) to support their differing views of the statute. We briefly address the legislative history, bearing in mind that the purpose of resorting to legislative history is to aid the court in determining what the legislature as an institution intended the statute to mean. On that point, we echo the dissent in *Errand v. Cascade Steel Rolling Mills, Inc.*, 320 Or 509, 888 P2d 544 (1995), identifying some of the pitfalls of relying too greatly on legislative history: "In general, an examination of legislative history is most useful when it is able to uncover the manifest general legislative intent behind an enactment." *Id.* at 539 n 4 (Graber, J., dissenting) (quoted in *Gaines*, 346 Or at 172-73 n 9). Other kinds of conclusions drawn from cherrypicked quotations of single legislators or of nonlegislator witnesses have to be carefully examined. *See id.* (Graber, J., dissenting) (cautioning that reliance on "the beliefs of a single legislator or witness" is "fraught with the potential for misconstruction").

With those principles in mind, we turn to the proffered legislative history of ORS 656.210(2)(b). We conclude that the testimony of the nonlegislator witnesses offered by the parties is consistent with, but adds little to, the textual analysis of the statute.

In 2001, the legislature enacted Senate Bill (SB) 485, which incorporated the statutory provision at issue in this case. Or Laws 2001, ch 865, § 3. As introduced, the bill proposed the creation of the supplemental disability benefit and the procedures for obtaining the benefit. During consideration of the bill, Jerry Keene, an appellate attorney specializing in appellate workers' compensation law, testified that

"there's *** language [in Section 3 of SB 485 that] connotes a clear intent to basically set up a raise or waive situation. *The worker has the opportunity to bring the fact that they work two jobs to the employer* within thirty days of the injury. *** *But they do bear the responsibility to get this information to the insurer* in a timely manner."

Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Mar 14, 2001, Tape 49, Side A (statement of Jerry Keene) (emphases added).

As the emphasized part of his testimony indicates, Keene explained to the committee that the bill placed the obligation on the worker to provide notice of secondary employment. Keene's testimony, as well as the rest of the legislative history, indicates that workers "bear the responsibility" for providing all the information necessary for processing a supplemental disability claim. *Id.* Keene also stated that diligence is crucial because "once the thirty day window *** comes and goes," the opportunity to receive supplemental benefits "will not be there anymore *** and that was fairly clear in the language [of Section 3]." *Id.*

Claimant emphasizes that Keene also stated that the injured worker has the opportunity to bring the fact that he or she works two jobs to the "employer." *Id.* Claimant also flags the testimony of a second nonlegislator witness, Jim Egan, who similarly testified that "all an injured worker would have to do would be to hand his or her pay-stub" from the secondary employer to his or her "employer" or "insurance carrier" for "proof enough that there was another job." Tape Recording, Senate Committee on Business, Labor and Economic Development, SB 485, Feb 2, 2001, Tape 18, Side A (statement of Jim Egan) (emphasis added). Claimant urges us to conclude that the Keene and Egan testimony demonstrates that the terms employer and insurer are "interchangeable" for purposes of providing notice. We draw a different conclusion, namely, that the proffered testimony of Keene and Egan is consistent with our reading of ORS 656.210(2)(b)(A), which generally requires the injured worker to direct information of his or her secondary employment to the insurer but which also allows the worker to give the requisite information to the employer in connection with the worker's initial claim. In the latter case, the employer,

because of its statutory obligation to process claims, will then be obliged to transmit the information to the insurer.

Accordingly, we reject claimant's contention that, when an injured worker does not communicate to the insurer or the employer within 30 days of the initial claim that she or he has multiple employers, despite having the ability to do so, the employer's preexisting knowledge, unconnected to the claims process, must be imputed to the insurer. Because claimant did not communicate to Liberty or Adams & Gray that she had secondary employment within 30 days of Liberty's receipt of her initial claim, which she could have accomplished by checking the box relating to secondary employment on either of two claims forms she filled out, and Liberty did not otherwise receive actual notice of her secondary employment, the board erred in affirming the ALJ's order directing DCBS, through ComPro, to pay claimant supplemental disability. Thus, we affirm the decision of the Court of Appeals and reverse and remand the board's order.

The decision of the Court of Appeals is affirmed. The order of the Workers' Compensation Board is reversed, and the case is remanded to the board for further proceedings.