LAGESEN, J.
*1106 *182 While surfing in Pacific City, plaintiff collided with a dory boat, sustaining severe injuries. He sued the state, alleging that it had been negligent in failing to provide adequate warnings of the risk posed by dory boats to surfers. After the trial court rejected the state's immunity defenses, a jury returned a verdict for plaintiff, to which the trial court applied the then-applicable $1.5 million statutory damages cap contained in ORS 30.271(2)(a).
Both parties have appealed. The state contends that the trial court erred in (1) concluding that it was not entitled to recreational immunity under ORS 105.682 and (2) denying its motion for a directed verdict on the ground of discretionary immunity, ORS 30.265(6)(c). Plaintiff asserts that the application of the statutory $1.5 million cap applicable to damages awards against the state, ORS 30.271(2)(a), violates plaintiff's state constitutional rights to a remedy under Article I, section 10, of the Oregon Constitution and to a jury trial under Article I, section 17, of the Oregon Constitution. We conclude that (1) the trial court correctly ruled that the state was not entitled to statutory recreational immunity; (2) the trial court did not err when it denied the state's motion for a directed verdict on the grounds of discretionary immunity; and (3) under Horton v. OHSU , 359 Or. 168, 376 P.3d 998 (2016), the application of the statutory damages cap did not violate plaintiff's rights under Article I, section 10, and Article I, section 17. We therefore affirm the judgment of the trial court.
I. BACKGROUND
Plaintiff, who was 14 years old at the time, was surfing at Pacific City near Cape Kiwanda when he was struck by a dory boat operated by defendant Martin. Martin was returning to shore and did not see plaintiff in the waves. The boat's propeller severed plaintiff's left arm. Although another surfer retrieved plaintiff's arm, and the arm was surgically reattached, plaintiff has suffered permanent physical impairment and post-traumatic stress syndrome as a result of the incident.
At the time of the accident, state officials had long been aware that surfers and dory boats were at risk of *183 collision at Pacific City. Nevertheless, the state did not post warning signs about that risk on the beach, or otherwise caution beachgoers about the risk. Plaintiff was not aware of the risk until he was injured.
Plaintiff brought this action for negligence against Martin and the state, seeking to recover for his losses. He alleged that the state "was negligent in failing to provide adequate warnings of the danger of collisions between dory boats and other persons at or near Cape Kiwanda."[1] As allowed by ORS 31.700,[2] plaintiff's parents consented to include damages for medical expenses in plaintiff's action.
Before trial, the state twice moved for summary judgment on the ground that the *1107 recreational immunity statute, ORS 105.682, barred plaintiff's claim against it. That statute immunizes the owner of an interest in land from liability for nonintentional torts arising out of the plaintiff's recreational use of the land under certain circumstances. As of the time of plaintiff's injury, it provided:
"(1) Except as provided by subsection (2) of this section, and subject to the provisions of ORS 105.688, an owner of land is not liable in contract or tort for any personal injury, death or property damage that arises out of the use of the land for recreational purposes, woodcutting or the harvest of special forest products when the owner of land either directly or indirectly permits any person to use the land for recreational purposes, woodcutting or the harvest of *184 special forest products. The limitation on liability provided by this section applies if the principal purpose for entry upon the land is for recreational purposes, woodcutting or the harvest of special forest products, and is not affected if the injury, death or damage occurs while the person entering land is engaging in activities other than the use of the land for recreational purposes, woodcutting or the harvest of special forest products.
"(2) This section does not limit the liability of an owner of land for intentional injury or damage to a person coming onto land for recreational purposes, woodcutting or the harvest of special forest products."
ORS 105.682 (2007).[3] The state's theory, generally stated, was that plaintiff's injuries arose out of his recreational use, allowed by the state, of either the ocean or the "ocean shore," as defined in ORS 390.605(2), both of which qualified as "land" of which the state was an "owner" for purposes of the statute.
In response, plaintiff argued, among other things, that the ocean and ocean shore were public trust lands, and that the state held its interest in the land in trust for the public. As a result, the state lacked authority to prohibit the recreational use of the ocean and ocean shore. Plaintiff reasoned that, because the state lacked authority to prohibit the public's use of the ocean and ocean shore for recreational purposes, it could not be said to have "permit[ted]" plaintiff to engage in the use of the ocean and ocean shore that led to his injury within the meaning of ORS 105.682(1).
The trial court agreed with plaintiff's interpretation of the statute. Noting that the state lacks authority to exclude the public from using the ocean shore and ocean for surfing and other recreational purposes, the court reasoned that plaintiff's "use was inherently not permissive and therefore recreational immunity does not apply in this case." The trial court, therefore, denied both of the state's motions for summary judgment asserting recreational immunity.
*185 At trial, the state moved for a directed verdict. The state did not reraise the issue of its entitlement to recreational immunity in that motion, but it did argue that, in view of the evidence presented at trial, a different form of statutory immunity-discretionary immunity under ORS 30.265(6)(c) -barred plaintiff from recovering on his claim against the state to the extent that the claim was predicated on the state's failure to install warning signs at the location where plaintiff was injured. See ORS 30.265(6)(c) (providing that the state (and other public bodies and their agents) is immune from liability for "[a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused"). The state contended that the evidence presented at trial compelled the finding that its failure to warn of the risks of the collision between dory boats and individuals using the beach was the product of the type of policy decision to which statutory immunity applies. In particular, the state argued that the absence of warning signs was a result of the state's "high level policy decision to work collaboratively" with the Doryman's Association to address the issue of warning signs. The trial court denied the motion.
The jury rejected plaintiff's claim against Martin. However, it found in favor of plaintiff *1108 on his claim against the state, finding that the state's negligence was 70 percent responsible for plaintiff's injuries and that plaintiff's own negligence was 30 percent responsible. The jury further found that plaintiff had suffered a total of $717,250.24 in economic damages and $3.1 million in noneconomic damages.
The trial court determined that $294,935.09 of the award for economic damages was for past medical bills attributable to his parents' claim that "was included in this action as authorized by ORS 31.700(1)." Reducing that amount by 30 percent to account for plaintiff's negligence, the court concluded that "judgment will be entered for $206,454.56 on [plaintiff's] parents' claim for past medical bills." The court then reduced the remaining $3,610,795.68 of the jury's award by 30 percent, to determine that plaintiff would be entitled to $2,527,556.98, absent application of the $1.5 million damages cap contained in ORS 30.271 (2)(a). Rejecting plaintiff's argument that application of the *186 damages cap violated his right to a remedy under Article I, section 10, and his right to a jury trial under Article I, section 17, the court concluded that plaintiff was entitled to entry of a judgment in the total amount of $1,706,454.56 plus $4,930.11 in costs against the state.
The state appeals, and plaintiff cross-appeals. The state assigns error to the trial court's denial of its multiple motions for summary judgment on the ground of recreational immunity and to the denial of its motion for a directed verdict on the ground of discretionary immunity. It contends that the recreational immunity statute, correctly construed, bars plaintiff from recovering damages against the state because plaintiff was engaged in a recreational activity at the time of his injury. Alternatively, it contends that the discretionary immunity statute bars plaintiff's recovery because, in the state's view, the evidence presented at trial compels the conclusion that the absence of a warning sign at the location of plaintiff's injury was the product of a discretionary policy decision. Plaintiff assigns error to the application of the $1.5 million statutory damages cap, reiterating his arguments that the application of the cap violates his rights under Article I, section 10, and Article I, section 17.
II. ANALYSIS
A. Recreational Immunity
1. Reviewability
Preliminarily, we must decide if the state's challenge to the trial court's rejection of its claim to recreational immunity is reviewable. Below, the state raised the issue of its entitlement to recreational immunity by way of two pre-trial summary judgment motions; on appeal, it raises the issue by assigning error to the trial court's denial of those two motions. But, "[i]n a case that has gone to trial, the denial of a summary judgment motion is not reviewable on appeal unless the motion rested on a 'purely legal' contention." Freeman v. Stuart , 203 Or. App. 191, 194, 125 P.3d 786 (2005) (quoting Seidel v. Time Ins. Co. , 157 Or. App. 556, 560, 970 P.2d 255 (1998) ); see also Payless Drug Stores v. Brown , 300 Or. 243, 708 P.2d 1143 (1985) ;
*187 Staten v. Steel , 222 Or. App. 17, 23-26, 191 P.3d 778 (2008), rev. den. , 345 Or. 618, 201 P.3d 909 (2009). In this context, a "purely legal contention" is one that can be decided without the establishment of any predicate facts. Freeman , 203 Or. App. at 194, 125 P.3d 786 (internal quotation marks omitted). "That means that facts are not merely undisputed, but immaterial, such as a facial challenge to the constitutionality of a statute." Id.
The state argues that its summary judgment motions rested on the type of "purely legal contention" that permits review under Freeman , at least insofar as the motions raised the issue of recreational immunity. That "legal contention," as framed by the state, "is whether recreational immunity applies only to land that the owner has authority to close to the public"-an issue which turns on the proper interpretation of the word "permit" in ORS 105.682. The state notes that, in Sweeney v. SMC Corp. , 178 Or. App. 576, 579 n. 3, 37 P.3d 244 (2002), we concluded that a similar question of statutory construction was the type of legal question that we could review in an appeal challenging the denial of a summary judgment motion:
*1109 Whether Oregon's Lemon Law applies to the sale of motor homes. Id . at 579, 37 P.3d 244.
It is difficult to say that the facts are "immaterial" to the statutory construction question presented. The facts are material because-as was the case in Sweeney -they show that the question is, in actuality, presented and justiciable in this case. In Sweeney , the statutory construction question of whether the Oregon Lemon Law applies to sales of motor homes was presented and justiciable only because the facts demonstrated that the allegedly defective vehicle at issue was a motor home. Had the facts shown, for example, that the vehicle in question was a tractor-trailer or a passenger bus, the question of the law's applicability to motor homes would not have been justiciable in the case. However, beyond demonstrating the presence of a justiciable statutory construction question, the facts were not otherwise material because the resolution of what the statute meant did not depend on the facts. Likewise, in this case, the issue regarding the proper interpretation of ORS 105.682 is presented and justiciable, only because the facts demonstrate that plaintiff was injured while engaged in recreational activity *188 on land in which the state lacks the authority to prohibit recreational use. But, as in Sweeney , apart from showing that that statutory construction issue is present and justiciable, the facts do not bear on the resolution of the issue. What the legislature intended by the word "permits" in ORS 105.682 is a legal question susceptible to resolution without reference to any particular facts.
Under those circumstances, as we implicitly concluded in Sweeney , Freeman 's specification that the facts must be "immaterial" to allow review of a trial court's denial of a motion for summary judgment does not bar review. That is, where the motion rests on a question of statutory construction and the facts are material only insofar as they demonstrate that that statutory construction question is raised by the facts of the case and justiciable, we may review a trial court's denial of summary judgment when that denial turned on the court's resolution of the statutory construction question. Consideration of the material facts, insofar as the facts demonstrate the justiciability of an otherwise pure legal question, comports with our constitutional obligation to ensure that we have jurisdiction to resolve the question. See Hale v. State of Oregon , 259 Or. App. 379, 383, 314 P.3d 345 (2013), rev. den. , 354 Or. 840, 326 P.3d 77 (2014) ("Courts cannot exercise jurisdiction over nonjusticiable controversies because a court cannot render advisory opinions.").
2. Whether ORS 105.682 applies to the owner of an interest in land who lacks authority to prohibit the public's recreational use of the land
We turn to the question of whether the recreational immunity statute, ORS 105.682, immunizes the state from liability arising out of the recreational use of land-such as the ocean and beaches-on which the state lacks the authority to prohibit recreational use by the public. That question is one of statutory construction, and we review the trial court's resolution of it for legal error. State v. Lobo , 261 Or. App. 741, 751, 322 P.3d 573 (2014). In conducting our review, our job is to ascertain the legislature's intent in enacting ORS 105.682. DCBS v. Muliro , 359 Or. 736, 742, 380 P.3d 270 (2016). We do so by examining the statutory text, context, and any pertinent legislative history.
*189 Multnomah CountySheriff's Office v. Edwards , 361 Or. 761, 771, 399 P.3d 969 (2017) ; State v. Gaines , 346 Or. 160, 171-73, 206 P.3d 1042 (2009).
Although several criteria must be present for statutory recreational immunity to apply, the parties' dispute focuses on one of them. The immunity provided by ORS 105.682 applies only to an owner of land (defined for purposes of the statute to be "[t]he possessor of any interest in any land," ORS 105.672(4) ) who "directly or indirectly permits any person to use the land for recreational purposes." ORS 105.682(1) (emphasis added). At issue is whether a landowner can be said to "permit" the recreational use of land where the owner has no legal authority to prohibit the recreational use of the land at issue. That is the question because, as the state acknowledges, its interest in the ocean and beaches is not one that permits it to preclude the recreational *1110 use of that land. Plaintiff argues that to "permit" the recreational use of land for purposes of the statute, the owner must have the authority to decide whether to allow or prohibit recreational use. The state, in contrast, contends that the word "permit" has a broader meaning, such that a landowner permits the recreational use of land if the owner has "made possible" the recreational use of the land in question, even if the owner does not have authority to decide whether or not to allow recreational use of that land.
Considering the plain meaning of the word "permit," both proposed interpretations are plausible. Many of the common definitions of the word contemplate that to "permit" something necessarily requires the authority to decide whether or not to allow it. Webster's tells us that "permit" can mean "to consent to expressly or formally"; to "grant leave for or the privilege of"; "to give (a person) leave"; or to "authorize." Webster's Third New Int'l Dictionary 1683 (unabridged ed. 2002). However, not all definitions of the word "permit" contemplate the existence of authority to allow or disallow. As the state emphasizes, "permit" can mean simply to "make possible." That definition, the state asserts, would encompass a "[land]owner who actively facilitates recreational use *** notwithstanding the lack of any right to prevent that use."
*190 Statutory context, which includes related statutes and case law interpreting the statute at issue, State v. Toevs , 327 Or. 525, 532, 964 P.2d 1007 (1998), provides more insight into the legislature's likely intentions and, ultimately, compels us to conclude that plaintiff's interpretation is the correct one. Particularly probative is ORS 105.676, which articulates the legislature's policy objective in enacting the recreational immunity statutes. It states:
"The Legislative Assembly hereby declares it is the public policy of the State of Oregon to encourage owners of land to make their land available to the public for recreational purposes, for gardening, for woodcutting and for the harvest of special forest products by limiting their liability toward persons entering thereon for such purposes and by protecting their interests in their land from the extinguishment of any such interest or the acquisition by the public of any right to use or continue the use of such land for recreational purposes, gardening, woodcutting or the harvest of special forest products."
ORS 105.676. By its plain terms, that provision indicates that the legislative objective in adopting the recreational immunity statutes was to provide an incentive for landowners to "make their land available to the public" for recreational use. That suggests that the legislature was targeting landowners who have the authority to decide whether to allow recreational use of their land. Where, as here, the nature of the owner's interest in land is one that already requires the landowner to allow recreational use, the statutory incentive serves no identifiable purpose. There is no need for the legislature to "encourage" owners of land to make their land available for recreational use where the owner is one that must make the land in question available for recreational use.
Our recent case law construing ORS 105.682 confirms that understanding of the legislature's likely intentions. In Landis v. Limbaugh , 282 Or. App. 284, 286, 385 P.3d 1139 (2016), rev. dismissed , 361 Or. 351, 393 P.3d 1183 (2017), we considered whether, under ORS 105.682, a county was entitled to recreational immunity from liability for harm that the plaintiff suffered while jogging on a county sidewalk. Construing the statute and, in particular, the word "permit," we concluded *191 that a landowner does not "permit" recreational use within the meaning of ORS 105.682 unless "the owner of land has exercised volition to make land available to be used for recreational or other specified purposes." Id . at 292, 385 P.3d 1139. In other words, "one critical determinant in recreational immunity is the landowner's decision to open land, not generally available, for the statutorily specified uses such as recreation." Id. at 294, 385 P.3d 1139. Consequently, because the county had not made a specific decision to allow recreational use on the sidewalk at issue but had, instead, made the sidewalks generally available for public use, recreational and otherwise, the recreational immunity statute did not apply. Id . at 296, 385 P.3d 1139. *1111 Our interpretation of the word "permits" in Landis largely disposes of the state's argument here. Under Landis , a landowner must make a volitional decision to open the land to the public for recreational use in order to "permit" the recreational use of the land within the meaning of ORS 105.682. That necessarily means that to "permit" recreational use within the meaning of the statute, an owner of land must have the authority to make the required volitional decision to allow recreational use. Where a landowner lacks that authority altogether, as is undisputedly the case here, the "critical determinant" of the "landowner's decision to open land, not generally available, for the statutorily specified uses such as recreation" is not present. Id .
The state acknowledges that, historically, the recreational immunity statutes have contemplated a "quid pro quo" arrangement under which immunity applies to those landowners who decide to open their land to the public for recreational purposes when that land otherwise would not be available to the public to use recreationally. However, the state urges us to conclude that the legislature expanded the scope of the statute when, in 1995, the legislature made the statute applicable to public landowners in addition to private landowners. In the state's view, the statute "no longer requires that the owner trade a right of access in exchange for immunity; were it otherwise, it would be unfair to owners of public land who encourage recreational use but often cannot trade a right of access in exchange for immunity." (Emphasis in state's brief.) The state further argues that *192 a 2007 amendment to the recreational immunity statute, making immunity applicable to landowners who receive money "from a public body in return for granting" public access, ORS 105.672(1)(b), likewise demonstrates a relaxing of the strict "quid pro quo" arrangement originally at the heart of the recreational immunity statute.
The short answer to the state's argument is that it conflicts both with the legislature's express articulation in ORS 105.682 of the legislative policy behind the recreational immunity statutes and with our decision in Landis . We note, in particular, that, in Landis , we reviewed the legislative history of the recreational immunity statute, including the history of the 1995 amendments, and concluded following that review that "the drafters enacted a quid pro quo policy." Landis , 282 Or. App. at 294, 385 P.3d 1139 (emphasis in original).
The longer answer is that we have again reviewed the legislative history of the 1995 and 2007 amendments. Nothing in the legislative history supports the view that the legislature intended to relax the historical "quid pro quo" at the heart of the recreational immunity statute when it made the statute applicable to owners of public lands and to people who received payments from public bodies to open their lands. The 1995 amendments were the product of House Bill (HB) 2296 (1995). Representative Kevin Mannix, in introducing the bill, stated that the goal of the bill was to encourage private landowners and those who are using public lands under special lease or permit arrangements to make lands available to the public for recreational uses by limiting liability. Tape Recording, House Natural Resources Committee, Subcommittee on Agriculture and Forestry, HB 2296, Jan. 30, 1995, Tape 4, Side A (statement of Rep Kevin Mannix). Additional discussions throughout the legislative history are consistent with Representative Mannix's initial statements. Those discussions indicate that the legislature's intention in making recreational immunity applicable to owners of interests in public lands was to make the immunity available to those owners who had the authority to decide whether to allow recreational use on the land, and also to clarify that the immunity applied to private companies that had leaseholds on government owned *193 land.[4] The legislative history of the 2007 amendment on which the state relies also does not suggest a legislative intention to abandon or relax the quid pro quo arrangement underlying *1112 the recreational immunity statute. Rather, the objective of that amendment appears to have been a clarification of an ambiguous part of the statute. See Staff Measure Summary, HB 2445 (2007).
Thus, as we explained in Landis , to be entitled to recreational immunity, an owner of an interest in land must have made a volitional decision to open the land to the public for recreational use. That means, necessarily, that, to be entitled to recreational immunity, an owner must have the authority to make a volitional decision whether or not to allow recreational use on the land in question. Because the state has not disputed-at least in any timely way-that it lacks the authority to make that sort of volitional decision to allow or disallow the recreational use of the ocean and *194 beaches, the state is not entitled to recreational immunity.[5] The trial court correctly denied the state's motions for summary judgment on the grounds of recreational immunity.
B. Discretionary Immunity
The state next assigns error to the trial court's denial of a directed verdict on its affirmative defense of discretionary immunity under ORS 30.265(6)(c). The state contends that the trial court should have determined, as a matter of law, that its alleged negligence with respect to failing to warn of the risks of collisions between dory boats and other users of the ocean and beach near Cape Kiwanda was the product of a policy decision of the type protected by ORS 30.265(6)(c). Because discretionary immunity is an affirmative defense on which the state bore the burden of proof at trial, to be entitled to a directed verdict on discretionary immunity grounds, the evidence must be such that all reasonable factfinders would have to find in the state's favor on that defense. See, e.g. , Robbins v. City of Medford , 284 Or. App. 592, 596, 393 P.3d 731 (2017) (stating standard for state to prevail on affirmative defense of discretionary immunity at summary-judgment stage of case in view of the burden of proof). We review to determine whether the uncontradicted evidence in the record entitled the state to prevail as a matter of law on discretionary immunity grounds.
*1113 Hager v. Tire Recyclers, Inc. , 136 Or. App. 439, 445, 901 P.2d 948 (1995), rev. den. , 323 Or. 690, 920 P.2d 549 (1996). Having conducted that review, we conclude that, on the record before the trial court, not all reasonable factfinders would agree that the omission of warnings at Cape Kiwanda resulted from a policy decision by state officials that was of the type that is protected by *195 discretionary immunity. The trial court therefore did not err when it denied the state's motion for a directed verdict on its affirmative defense of discretionary immunity.[6]
C. Damages Cap
The final issue before us is whether the trial court's application of the damages cap under ORS 30.271 to limit plaintiff's recovery violated his rights under the remedies clause of Article I, section 10,[7] or under the jury trial guarantee of Article I, section 17.[8] , [9] The Supreme Court's decision in Horton , 359 Or. 168, 376 P.3d 998, which assessed the constitutionality of the application of ORS 30.271 to limit a plaintiff's recovery of damages against a state employee, squarely resolves that issue in this case.
Regarding plaintiff's argument under Article I, section 17, Horton holds that Article I, section 17, is a procedural right to receive a jury trial in civil cases where such right existed at common law, not a guarantee to receive the amount awarded by a jury. Horton , 359 Or. at 250, 376 P.3d 998. Accordingly, the application of the cap does not violate plaintiff's rights under Article I, section 17.
Regarding plaintiff's argument under Article I, section 10, Horton holds that the damages cap contained in ORS 30.271 may be applied to limit the damages recoverable *196 against the state or one of its employees, provided that application of the cap does not limit a plaintiff's recovery to a "paltry fraction" of the damages suffered. 359 Or. at 221, 376 P.3d 998. In Horton , the Supreme Court concluded that the application of the cap was consistent with Article I, section 10, when it resulted in the plaintiff recovering 25 percent of the jury's $12 million verdict. Although the court did not provide clear guidance on what recovery would be so insubstantial as to violate Article I, section 10, in this case, notwithstanding the trial court's application of the damages cap, the plaintiff recovered 66.4 percent of the amount awarded by the jury (once the verdict was reduced to take into account the jury's finding that the plaintiff was 30 percent at fault for the accident). As that fraction is well above what the Supreme Court deemed adequate in Horton , we conclude that the application of the cap to plaintiff's recovery in this case, which resulted in him recovering approximately two-thirds of the amount that he would have received absent the application of the cap, does not violate Article I, section 10.
III. CONCLUSION
For the foregoing reasons, we affirm the judgment of the trial court.
Affirmed on appeal and cross-appeal.

Plaintiff initially alleged that the state was negligent in three additional respects. Those specifications were dismissed on summary judgment and are not at issue in this appeal.

At the time this case was filed, ORS 31.700 provided:
"(1) When the guardian ad litem of a child maintains a cause of action for recovery of damages to the child caused by a wrongful act, the parent, parents, or conservator of the estate of the child may file a consent accompanying the complaint of the guardian ad litem to include in the cause of action the damages as, in all the circumstances of the case, may be just, and will reasonably and fairly compensate for the doctor, hospital and medical expenses caused by the injury.
"(2) If the consent is filed as provided in subsection (1) of this section and the court allows the filing, no court shall entertain a cause of action by the parent, parents or conservator for doctor, hospital or medical expenses caused by the injury."
ORS 31.700 (2009). The statute has been amended in minor ways since that time. All references to ORS 31.700 in this opinion are to the 2009 version of the statute.

The legislature amended the statute in 2009 to specify that gardening is one of the activities to which the immunity applies. Or. Laws 2009, ch. 532, § 4. Unless otherwise indicated, all references to ORS 105.682 in this opinion are to the 2007 version of the statute.

For example, John Brenneman of Idaho Power advocated for broadening the bill by taking out "fee title" ownership and replacing it with "any" ownership to make the bill applicable to all types of land. He stated that his concern was that Idaho Power administers BLM land on the Snake River and, as a matter of fairness, the bill should cover this BLM land, despite the fact that Idaho Power does not own the land in fee title. He was questioned about what type of control/ ownership Idaho Power had over the land. Brenneman clarified that Idaho Power does not lease the land but works with the federal government in regulating the land and has jurisdiction over recreational aspects of the land. Tape Recording, House Natural Resources Committee, Subcommittee on Agriculture and Forestry, HB 2296, Jan. 30, 1995, Tape 5, Side A (statement of John Brenneman).
Ken Evans of Oregon Anglers also supported the bill and the expansion to cover all types of lands, regardless of ownership structure. Alan Willis of the Port of Portland stated that he wanted ports and similar public lands to get the same treatment as private owners under the bill. He requested that language excluding lands owned by the state or public subdivisions of the state be removed from the statute. Willis argued that removing that language would allow ports to be covered with immunity. Tape Recording, House Natural Resources Committee, Subcommittee on Agriculture and Forestry, HB 2296, Jan. 30, 1995, Tape 4, Side B (statements of Ken Evans and Alan Willis).
At the Senate Water and Land Use Committee meeting, Ken Armstrong of Oregon Public Ports Association emphasized that the Port of Portland owns substantial waterfront property that is of interest to the public recreationally and, without the legislation covering ports, it could cause ports to run into serious problems. John Brenneman again discussed the importance of including public lands, and those persons who have control over public lands, in the bill. He stated that inclusion would encourage those who are in charge of managing public lands to allow the public on it. Tape Recording, Senate Water and Land Use Committee, HB 2296, Apr. 26, 1995, Tape 127, Side B (statements of Ken Armstrong and John Brenneman).

In its initial brief, the state argues that it can regulate the use of the ocean and its beaches, even if it does not have the authority to preclude all recreational use. In its memorandum of additional authorities responding to Landis , the state appears to take the position that it has the authority to prohibit the recreational use of the ocean and beaches. To the extent that the state is making that argument, it appears to be a fundamental shift in the position that it has taken throughout most of this case. But, even if that argument is properly before us, it does not assist the state. If, as the state posits, it has the authority to decide whether or not to allow the recreational use of the ocean and its beaches, the state presented no evidence that it, in fact, made the type of volitional decision to allow the recreational use of the ocean and its beaches that Landis holds is a prerequisite for entitlement to recreational immunity. Thus, under Landis , the state still would not have established its entitlement to recreational immunity.

We note that the state did not ask that its affirmative defense of discretionary immunity be submitted to the jury once the trial court denied its motion for a directed verdict. Plaintiff does not make anything of it on appeal, so we save for another day the question of how a defendant's failure to request that an affirmative defense be submitted to the jury might bear on the availability of appellate review of a trial court's decision to deny a defendant's motion for a directed verdict on an affirmative defense. It is unclear why the state did not ask that the jury be instructed on the defense. The trial court's denial of the state's motion for a directed verdict, as we understand it, simply meant that the court determined that there were factual issues for the jury with respect to that defense. Had the state submitted the defense to the jury, perhaps it would have found in its favor.

Article I, section 10, provides that "[n]o court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Article I, section 17, provides that "[i]n all civil cases the right of Trial by Jury shall remain inviolate."

Plaintiff also appears to argue that the trial court applied the damages cap in an incorrect manner. To the extent that plaintiff is making that argument, we reject it as unpreserved.