Argued September 17; reversed November 5; rehearing denied
December 22, 1936; mandate issued May 14; pub-
lished as of June 2, 1937

## WINSTON BROTHERS CO. ET AL. *v.* STATE TAX COMMISSION ET AL.

(62 P. (2d) 7)

*Howard P. Arnest*, of Portland, for appellants.

*Carl E. Davidson*, Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for respondents.

RAND, J. The plaintiffs, in 1934, derived a profit from the performance of a contract which they had jointly entered into with the War Department for the

reconstruction and repair of the south jetty at the mouth of the Columbia river.

The state of Oregon claims that this profit is subject to taxation.

Winston Bros. Company is a Minnesota corporation, having its principal office in that state. It transacted no business in Oregon during that year except that on account of which the tax is sought to be imposed, which is an excise tax for the privilege of doing business within this state. The other plaintiffs are copartners, each residing in the state of California and, except for the work done under this contract and under another contract with the War Department for work on the Bonneville dam, they too transacted no business within the state during that year. The tax sought to be imposed against them is an income tax.

To obtain a determination as to whether the profits involved in this action are taxable by the state of Oregon, the plaintiffs brought this action praying for a declaratory judgment and, from a judgment against them, plaintiffs appealed.

■ Plaintiffs' first contention is that if the right to tax these profits is sustained it will impede and embarrass the federal government in the execution of a national function. They base this contention upon the fact that the jetty on which the repairs were made was built and maintained by the federal government as an aid to navigation and that to permit any part of these moneys so paid for its repair to be taken by the state as taxes would embarrass the government in the execution of its national powers.

Plaintiffs further contend that, in doing this work, they were acting as a means or agency of the national government and, therefore, are not subject to the tax for any profits realized in the performance of the work.

We think that this contention cannot be sustained. In *Thomson v. Union Pacific Railroad,* 9 Wall. (U. S.) 579, 591 (19 L. Ed. 792), the court said:

"We do not doubt the propriety or the necessity, under the Constitution, of maintaining the supremacy of the General Government within its constitutional sphere. We fully recognize the soundness of the doctrine, that no State has a 'right to tax the means employed by the government of the Union for the execution of its powers.' But we think there is a clear distinction between the means employed by the government and the property of agents employed by the government. Taxation of the agency is taxation of the means; taxation of the property of the agent is not always, or generally, taxation of the means.

"No one questions that the power to tax all property, business and persons, within their respective limits, is original in the States and has never been surrendered. It cannot be so used, indeed, as to defeat or hinder the operations of the National government; but it will be safe to conclude, in general, in reference to persons and State corporations employed in government service, that when Congress has not interposed to protect their property from State taxation, such taxation is not obnoxious to that objection.

. "We perceive no limits to the principle of exemption which the complainants seek to establish. It would remove from the reach of State taxation all the property of every agent of the government. Every corporation engaged in the transportation of mails, or of government property of any description, by land or water, or in supplying materials for the use of the government, or in performing any service of whatever kind, might claim the benefit of the exemption."

Again, in *General Construction Co. v. Fisher,* 149 Or. 84 (39 P. (2) 358, 97 A. L. R. 1252), the same question was presented to this court, and, in overruling it, the court said:

"When plaintiff, as an independent contractor for gain, entered into a contract to perform labor and fur-

nish materials to the Federal government, it did not thereby become a part of, or an instrumentality of, the United States government, and its property and right to conduct business within the state are not immune from taxation by the state wherein it is located in performing its contract.''

In support thereof, the court cited numerous cases, all of which support the doctrine thus announced.

Plaintiffs' next contention is that the contract was completely performed by the plaintiffs on property the title to which, by consent of the state, had passed to the federal government and over which the state had ceded to the United States the exclusive legislative jurisdiction, reserving to the state merely the right to serve state process in civil and criminal matters.

The undisputed evidence in the case shows that the work which the plaintiffs contracted to perform and did perform consisted of rebuilding parts of the south jetty at the mouth of the Columbia river that had washed away; that this jetty was constructed as an aid to navigation in 1885 by the federal government; that it is composed of rock built up to an elevation of 25 feet above low water on which the government owns and maintains a trestle and railroad track for the operation of trains to transport rock needed for the reconstruction or repair of the jetty; that the jetty commences on Fort Stevens, a military reservation of the United States, and extends directly therefrom on to certain tidelands and from thence over lands underlying navigable waters, and is some six or seven miles in length; that the reconstruction work performed by the plaintiffs was done upon that part of the jetty lying below and beyond said tidelands; and that the work performed by the plaintiffs consisted merely in replacing with rock

the parts of the jetty that had been washed away and in repairing the trestle and track. This rock, the evidence shows, was quarried in the state of Washington and was delivered to the plaintiffs free on board cars on said military reservation by the Spokane, Portland & Seattle Ry. Company, from which point it was transported over the government-owned track on to the jetty and to the place of use; and that no part of the work performed by the plaintiffs was performed at any place outside the military reservation except that performed on the jetty.

Obviously, therefore, if the state of Oregon owns any lands over which plaintiffs' operations were performed, they necessarily consist of the lands covered by the military reservation of Fort Stevens, the tidelands over which the jetty is in part built or the lands underlying the navigable waters over which it is constructed.

■■ It is well settled that, upon admission of this state into the Union, the state acquired title in its proprietary capacity to all lands within its borders which are covered and uncovered by the tide, and also to all lands lying under the navigable waters of the state. As to those lands lying between the high and low water mark, commonly referred to as tidelands, the state became the absolute owner of them, subject only to the paramount right of navigation inherent in the public, and the lands became subject to its jurisdiction and disposal. Until disposed of by the state, the state held the title to these lands in its proprietary capacity and, after they had been disposed of by the state, their grantees took them free from any right therein of the upland owner and subject only to the paramount right of navigation: *Bowlby v. Shively,* 22 Or. 410 (30 P. 154), af-

firmed in *Shively v. Bowlby,* 152 U. S. 1 (38 L. Ed. 331, 14 S. Ct. 548) ; *Astoria Exchange Company v. Shively,* 27 Or. 104 (39 P. 398, 40 P. 92) ; *Corvallis & E. R. Co. v. Benson,* 61 Or. 359 (121 P. 418). See also *Hinman v. Warren,* 6 Or. 408, *Parker v. Taylor,* 7 Or. 435, and *Parker v. Rogers,* 8 Or. 183.

■ As to the other class, the lands underlying the navigable waters of the state, although the title passed to the state by virtue of its sovereignty, its rights were merely those of a trustee for the public. In its ownership thereof, the state represents the people, and the ownership is that of the people in their united sovereignty, while the waters themselves remain public so that all persons may use the same for navigation and fishing. These lands are held in trust for the public uses of navigation and fishery, and the erection thereon of wharves, piers, lighthouses, beacons, sea walls and jetties, and other facilities of navigation and commerce. Being subject to this trust, they are *publici juris;* in other words, they are held for the use of the people at large. Unlike tidelands, therefore, the state can make no sale or disposal of the soil underlying its navigable waters so as to prevent the use by the public of such waters for the purposes of navigation and fishing, but must hold them in trust for the public : *Cook v. Dabney,* 70 Or. 529 (139 P. 721) ; *Alsos v. Kendall,* 111 Or. 359 (227 P. 286) ; *Gatt v. Hurlburt,* 131 Or. 554 (284 P. 172).

The act of Congress admitting this state into the Union, in part, provided:

"* * * all the navigable waters of said state, shall be common highways and forever free, as well as to the inhabitants of said state as to all other citizens of the United States, without any tax, duty, impost, or toll therefor." Vol. 1, Oregon Code 1930, p. 33.

■ Moreover, the state holds the lands underlying navigable waters subject to the right of Congress, under Article I, section 8, clause 3, of the federal constitution, to regulate commerce and navigation thereover. Under this provision, says Gould, "the right of Congress to regulate commerce includes the power to regulate navigation upon the navigable waters of the United States, and to keep such waters open and free for the purposes of intercourse with foreign nations and between different States. * * * The power of Congress upon this subject does not stop at the boundaries of the States, and, when exercised, is exclusive of State authority". Gould on Waters, 1883 Ed., section 34.

■ An examination of the statutes of this state will disclose that in 1864 the legislature expressly granted to the United States all the right, title and interest of the state "in and to the land in front of Fort Stevens, and Point Adams, situate in this state, and subject to overflow, between high and low tide". See Special Laws of Oregon, 1864, p. 72. Under this grant, the title to all the tidelands in front of Fort Stevens over which the jetty in question is constructed passed to and became vested in the United States, where it now resides. It thus became the absolute property of the United States over which, by virtue of its ownership, the United States has exclusive legislative jurisdiction.

■ In 1874, the legislature passed an act which provided generally that:

"Whenever the United States desire to acquire title to land belonging to the state, and covered by the navigable waters of the United States, within the limits hereof, for the site of a lighthouse, beacon, or other aid to navigation, and application is made by a duly authorized agent of the United States, describing the site required for one of the purposes aforesaid, then the gov-

ernor of the state is authorized and empowered to convey title to the United States, and to cede to the said United States jurisdiction over the same; provided, no single tract shall contain more than ten acres, and that the state shall retain concurrent jurisdiction, so far that all process, civil or criminal, issuing under the authority of the state, may be executed by the proper officers thereof upon any person or persons amenable to the same within the limits of land so ceded, in like manner and to like effect as if this act had never been passed.'' (See section 60-1302, Oregon Code 1930.)

The act above referred to is still in force and unrepealed and was in force in 1885 when the national government constructed the south jetty at the mouth of the Columbia river. Pursuant to that general authority, upon the construction of the jetty, the title to the soil on which it rests, so far as such soil underlies navigable waters, passed to the United States. By the terms of the act, the United States acquired exclusive jurisdiction to these lands covered by the jetty, save and except the state retained concurrent jurisdiction in so far only that it could thereafter serve all process, civil or criminal, issuing under the authority of the state, upon any person or persons amenable thereto within the limits of the land so ceded, and this amounted to a complete relinquishment by the state of all rights upon the part of the state to exercise any legislative authority thereover whatsoever.

In 1913, by chapter 33, L. 1913, now section 60-1305, Oregon Code 1930, the legislature ceded to the United States the exclusive jurisdiction over the military reservation of Fort Stevens, merely reserving the right to serve process upon persons amenable thereto in civil or criminal cases.

■ ■ It will thus be seen that there is no testimony in the record, nor can there be, to sustain the finding that the plaintiffs, in the performance of their work under their contract, were compelled to or did travel over lands belonging to the state of Oregon, and, there-fore, that the decision of the circuit court, so far as based on state ownership of any part of the land over which the jetty was constructed or where the plaintiffs did their work, cannot be sustained under the evidence. Nor can we find any other ground upon which the right of the state to impose this tax upon the plaintiffs, or either of them, can be sustained. The contract was completely performed either on the reservation or the jetty, both of which were within the exclusive legislative jurisdiction of the United States. All material used by the plaintiffs was purchased and delivered to them upon the military reservation of Fort Stevens and, as stated, the plaintiffs were not residents of this state and transacted no other business subject to tax within the state during the time for which the state claims the right to impose a tax.

While it is a rule of almost universal application that the power of the state, acting through its governmental agencies to tax its citizens, is absolute and unlimited as to persons and property and that every person within the jurisdiction of the state, whether a citizen or not, is subject to this power, yet, as said in *Endicott, Johnson & Company v. Multnomah County,* 96 Or. 679 (190 P. 1109) : "A tax imposed without jurisdiction over either persons or property is void". And, since the state had no legislative jurisdiction over any of the places where the work was done in the performance of the contract and such places were each and all under the exclusive legislative jurisdiction of the national government, this

work, so far as taxation purposes by the state are concerned, might as well have been done in the state of Washington as upon the military reservation and other property of the United States.

Upon this question, see *United States v. Cordy,* 58 Fed. (2d) 1013, where the question was whether the state of Maryland could tax gasoline delivered to the Post Exchange at Fort George G. Meade, which was a military reservation of the United States, situate within the boundaries of the state of Maryland. In that case, the court said:

"* * * the delivery was not made within the State of Maryland, * * *

"It is not, nor can it be reasonably contended that Fort George G. Meade is in other than exclusive federal territory."

See also *Foley v. Shriver,* 81 Va. 568, where it was held that lands purchased within the state of Virginia, with her consent, for a national home for disabled volunteer soldiers "were no longer a part of the State of Virginia".

See also *Standard Oil Co. v. California,* 291 U. S. 242 (78 L. Ed. 775, 54 S. Ct. 381), where the state of California undertook to levy a license tax upon gasoline distributors for gasoline sold and delivered to the Post Exchange in the Presidio, and it was held that: "A state cannot legislate effectively concerning matters beyond her jurisdiction and within territory subject only to control by the United States."

See also *Lowe v. Lowe,* 150 Md. 592 (133 Atl. 729, 46 A. L. R. 983), where the court said:

"The great weight of authority is to the effect that lands acquired in accordance with the provisions of the federal constitution cease to be a part of the state, and

become federal territory, over which the federal government has complete and exclusive jurisdiction and power of legislation. It is therefore clear that persons residing upon the government reservation at Perry Point are not residents of the State of Maryland for the purpose of exercising the right of franchise, for taxation purposes, or for school purposes, for the reason that they reside upon territory belonging to the United States and not the State of Maryland; and, in our opinion, for the same reason, they are not such residents of the State as would entitle them to file a bill for divorce in any of the courts of the state.''

See also *Yellowstone Park Trans. Co. v. Gallatin County,* 31 Fed. (2d) 644, where the court stated the question and its decision in the following words:

''The principal question for decision on the present appeal is this: May the taxing officers of the County of Gallatin, in the State of Montana, impose taxes on personal property owned by a Delaware corporation and having its situs in that portion of the Yellowstone National Park within the territorial limits of that county, in view of the act of the Montana Legislature, approved February 14, 1891 (Laws 1891, p. 262), which ceded to the United States exclusive jurisdiction over and with respect to all lands within the state which were or might be embraced with the Yellowstone National Park, together with such other lands as were then or might thereafter be occupied and held by the United States for military purposes, reserving only concurrent jurisdiction for the execution of process, civil and criminal, lawfully issued by the courts of the state. This question must be answered in the negative.''

See also *United States v. Wurtzbarger,* 276 Fed. 753, where a murder had been committed upon the premises of the Chemawa Indian School in Marion county, Oregon, the purchase of which premises had been consented to by a joint resolution of the legislature. Judge Wolverton, in passing upon the question of whether the

crime was triable in the federal court, took occasion to construe Article I, section 8, clause 17, of the federal constitution, which provides:

"The congress shall have power— * * *

"To exercise exclusive legislation in all cases whatsoever, over such district * * *, and to·exercise like authority over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings".

and he said:

"The argument of counsel is that, under this clause of the Constitution read in its entirety, there must be both a cession by the state and an acceptance by Congress before the general government can acquire exclusive jurisdiction over the lands involved. The argument, however, overlooks the grammatical construction of the clause, which recites two contingencies under which the general government may acquire exclusive jurisdiction, the latter of which is that Congress shall have power 'to exercise like authority over all places purchased by the consent of the Legislature of the state * * * for the erection of forts, magazines, arsenals, dockyards, and other needful buildings.' The first of the contingencies relates to the seat of government of the United States, and the second to the acquirement of places for the erection of forts, magazines, and the like. As to these latter, when the title is acquired by purchase by consent of the legislature of the state, the federal jurisdiction is exclusive of all state authority. 'This follows,' says the Supreme Court in Ft. Leavenworth R. R. Co. v. Lowe, 114 U. S. 525, 532, 5 Sup. Ct. 995, 29 L. Ed. 264, 'from the declaration of the Constitution that Congress shall have "like authority" over such places as it has over the district which is the seat of government; that is, the power of "exclusive legislation in all cases whatsoever." '

"It will hardly be disputed that 'exclusive legislation' signifies exclusive jurisdiction; and, as we have

seen, the general government acquires such jurisdiction by purchase and the consent of the state, which, the conditions being performed, vests by declaration of the Constitution.''

Another case cited by counsel is *Sollitt & Sons Construction Company v. Commonwealth,* 161 Va. 854 (172 S. E. 290, 91 A. L. R. 774). That case points out specifically the grounds upon which a nonresident federal contractor may be liable to a license tax of the state in which the contractor performs the work. There, the contractor had contracted to erect a postoffice building in Lynchburg on lands of the federal government, but, in doing the work, he was compelled to occupy the sidewalks on the adjacent streets to the exclusion of pedestrians and, because of such occupancy, the power of the state to impose the tax was upheld. The court stated the reasons for its decision in the following words:

"The first contention of the company is that the tax statutes cannot be construed to impose a license tax against the company, for the reason that the company is not transacting the business of a contractor in Virginia. We are unable to concur in that contention. The proof shows conclusively that it is a physical impossibility for the company to execute its contract without that which, in effect, amounts to an appropriation of the state's property, to the denial, as a matter of fact, of the right of citizens to its usual and proper use. If, then, the manual execution of the company's contract requires that it be executed in part within the state, in contradistinction to its execution wholly within the confines of government property, then it must follow that the license tax imposed is within the purview of the statute requiring a license for the privilege of transacting business in this state.

"The further contention is that the tax statutes are not applicable to the tax imposed, for the reason that it is sought to extend the state's jurisdiction to prop-

erty over which the federal government has exclusive legislative jurisdiction, under article 1, section 8, cl. 17, of the Federal Constitution, and because the statutes infringe upon the due process clause of the Fourteenth Amendment.

"It is conceded by the commonwealth that the federal government has acquired the fee in the land upon which it proposes to erect the post office building in the city of Lynchburg. Were it possible for the company to carry out its contract without appropriating to its use the streets of the city, in the manner pointed out, the levy of the tax would be void. The mere use of the highways in common with citizens of the state cannot constitute a basis for the imposition of the license. The basis of the tax, however, is found in the distinction between general use and sole appropriation of the highway. In its last analysis, it conclusively appears that the company is not performing its contract solely upon government property; it is in no sense an instrumentality of the government."

In *United States v. Tucker,* 122 Fed. 518, the question of whether a dam on Green river in the state of Kentucky came within the purview of Article I, section 8, clause 17, of the federal constitution, was disposed of by the court as follows:

"While there might possibly be some difficulty (under the rule ejusdem generis) if the questions were res integra, as to the strictly proper construction and applicability to the case of locks and dams of the words, 'for the erection of forts, magazines, arsenals, dockyards, and other needful buildings,' used in the clause of the Constitution above quoted, the cases seem to leave no doubt that the broadest construction has been wisely put upon that language—one which makes it cover all structures and all places necessary for carrying on the business of the national Government."

The defendants place their main reliance upon *Gromer v. Standard Dredging Co.,* 224 U. S. 362 (56 L.

Ed. 801, 32 S. Ct. 499), where the majority of the court held that the territory of Porto Rico could impose a tax upon the boats and machinery of the defendant company while being employed in dredging the harbor of San Juan under a contract with the government of the United States, and that such property was not exempt from taxation merely because it was then being exclusively used by the owner in carrying out such contract. Defendants argue that if such property, while so employed, was taxable by Porto Rico, then the tax sought to be imposed in this case must be valid upon like grounds. It must be borne in mind that the territory of Porto Rico was acquired by the United States by conquest and not by discovery and, therefore, that the United States, as conqueror, could impose any law thereover that it saw fit to do. In exercising its authority and in granting autonomy to Porto Rico, the Congress did not reserve to the United States governmental control over its harbor areas and navigable waters but, on the contrary, conferred such control and jurisdiction to Porto Rico. In construing that act and because such jurisdiction had been conferred upon Porto Rico, the majority of the court said:

"The purpose of the act is to give local self-government, conferring an autonomy similar to that of the States and Territories, reserving to the United States rights to the harbor areas and navigable waters for the purpose of exercising the usual national control and jurisdiction over commerce and navigation.

"The United States could have reserved government control and exercised it as it does in instances, by the consent of the States, over certain places in the States devoted to the governmental service of the United States. We do not think, as we have said, that the United States has done so," etc.

The other members of the court concurred with that view but dissented merely upon the ground that the property sought to be taxed had not acquired a taxable situs within the jurisdiction of the territory of Porto Rico, and, in so holding, said:

"We agree with the decision of the court that the Territory of Porto Rico has jurisdiction for taxing purposes over the harbor and waters in question and that the use of the property for Government purposes does not exempt it from taxation, and therefore do not dissent from anything that is said in the opinion of the court upon those subjects. Our objection to the judgment of reversal is that, as we see it, there is ground of decision in the court below, ample to sustain its decree, which does not turn upon the determination of the controversy as to the political jurisdiction over these waters. In our opinion, the property of the Dredging Company had not acquired a taxable situs within the jurisdiction of the Territory of Porto Rico."

For the reasons stated, the judgment of the circuit court must be reversed and it is so ordered. The cause, therefore, will be remanded to the court below with directions to enter a judgment in favor of plaintiffs.

CAMPBELL, C. J., not sitting.