Argued and submitted May 15, 2019, at Mt. Hood Community College, Gresham, Oregon; decision of Court of Appeals reversed, and case remanded to Court of Appeals for further proceedings May 21, 2020

Benjamin McCORMICK,
*Respondent on Review,*

*v.*

STATE OF OREGON,
by and through the
Oregon State Parks and Recreation Department,
*Petitioner on Review.*

(CC 14CV00131) (CA A159931) (SC S066206)

466 P3d 10

Plaintiff brought an action against the state for injuries he sustained while recreating in Lake Billy Chinook. The state moved for summary judgment, asserting that it was entitled to recreational immunity under ORS 105.682. Plaintiff opposed the motion on the ground that that statute applies when the landowner permits the public to recreate on its land, and the state could not "permit" recreation at Lake Billy Chinook because it had no authority to prohibit that use. The trial court granted that state's motion. On appeal, the Court of Appeals reversed. *Held*: For purposes of the recreational immunity statute, an owner can "permit" public recreational use of its land, even if it cannot prohibit that use, by, among other things, making that use possible by providing access to and developing the land.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

En Banc

On review from the Court of Appeals.*

Peenesh Shah, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jordan R. Silk, Assistant Attorney General.

Shenoa Payne, Richardson Wright LLP, Portland, Oregon, argued the cause and filed the brief for respondent on review.

_____

* Appeal from Jefferson County Circuit Court, Gary Williams, Judge. 293 Or App 197, 427 P3d 199 (2018).

Michael J. Jeter, Assistant Deputy City Attorney, City of Portland, Portland, filed the brief for *amicus curiae* City of Portland. Also on the brief was Denis M. Vannier, Senior Deputy City Attorney.

Kathryn H. Clarke, Portland, filed the brief for *amicus curiae* Oregon Trial Lawyers Association.

Cortney D. Duke-Driessen, Washington County Counsel, Hillsboro, filed the brief for *amici curiae* Oregon Association of Counties, League of Oregon Cities, & Special Districts Association of Oregon. Also on the brief was Christopher Gilmore, Senior Assistant County Counsel.

James A. Fraser, Bend, filed the brief for *amicus curiae* Bend Park and Recreation District. Also on the brief was Mark G. Reinecke.

DUNCAN, J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

**DUNCAN, J.**

This case concerns the scope of the recreational immunity statute, ORS 105.682. As relevant here, that statute limits an owner's liability for injuries on its land if it "directly or indirectly permits" the public to use the land for recreational purposes. Plaintiff brought this action against the state for injuries he sustained while recreating in Lake Billy Chinook. The state moved for summary judgment, asserting that it was entitled to recreational immunity under ORS 105.682. In response, plaintiff contended that the state did not "directly or indirectly permit" the public to use the lake for recreational purposes. Specifically, he contended that, under both the public trust doctrine and the public use doctrine, the public already had a right to use the lake for recreational purposes and, therefore, the state did not "permit" that use. The trial court granted the state summary judgment, but the Court of Appeals reversed. *McCormick v. State Parks and Recreation Dept.*, 293 Or App 197, 427 P3d 199 (2018). On review, we reverse the Court of Appeals decision. As we explain below, for the purposes of the recreational immunity statute, an owner can "permit" public recreational use of its land, even if it cannot completely prohibit that use. More specifically, an owner can "permit" public recreational use of its land if, among other alternatives, it makes that use possible by creating access to and developing the land for that use.

## I.   HISTORICAL AND PROCEDURAL FACTS

We begin with the facts, which we state in the light most favorable to plaintiff. *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997) (when reviewing a trial court's grant of summary judgment, an appellate court views the evidence in the light most favorable to the nonmoving party). Plaintiff's claims arise from his recreational use of Lake Billy Chinook, a reservoir created by the Round Butte Dam at the confluence of three rivers: the Crooked River, the Deschutes River, and the Metolius River. The lake is mostly surrounded by Cove Palisades State Park. The state has built roads and three "day use" areas in the park. Without the day use areas, it would be difficult to reach the lake

because it is in a steep-walled canyon. According to plaintiff, "the only way to safely access the lake is to use one of the three day use areas." In the day use areas, there are parking lots, boat ramps, piers, and swimming areas. The public uses the lake for recreational activities, including boating, fishing, and swimming.

Plaintiff and his family drove to a day use area, paid a five-dollar fee, and parked their car. Plaintiff went to the edge of the lake, ran out on a gabion pier, and dove in the water. He hit his head on a submerged boulder and was seriously injured.

Plaintiff later brought this personal injury action against the state, claiming that the state's negligence with respect to the boulder contributed to his injuries. In his complaint, plaintiff alleged that the state

"expressly or impliedly led the public to believe that the Day Use Area was intended to be used for water sports *** and that such use was not only acquiesced in by [the state], but was also in accordance with the intention or design with which the Day Use Area was adapted and prepared."

In addition, plaintiff alleged, the pier from which he dove "was open to, and made available for use by, [the state's] invitees, including [plaintiff], as part of the Day Use Area's preparation and use as a water sports destination."

The state moved for summary judgment, asserting that it was entitled to recreational immunity under the recreational immunity statutes, ORS 105.672 to 105.696. As relevant here, the recreational immunity statute, ORS 105.682, provides:

"*an owner of land is not liable* in contract or tort *for any personal injury* *** that arises out of the use of the land for recreational purposes *** *when the owner of land either directly or indirectly permits any person to use the land for recreational purposes* *** [and] the principal purpose for [the person's] entry upon the land is for recreational purposes ***.*"

(Emphases added.)

For the purposes of the recreational immunity statutes, "owner" is defined broadly; it includes "the possessor of any interest in any land, including but not limited to the holder of any legal or equitable title, a tenant, a lessee, an occupant, the holder of an easement, the holder of a right of way or a person in possession of the land." ORS 105.672(4)(a). "Land" is also defined broadly; it means "all real property, whether publicly or privately owned." ORS 105.672(3). An owner is not entitled to recreational immunity if the owner intentionally injures a person, ORS 105.682(2), or if the owner charges certain fees for the use of the land for recreational purposes. ORS 105.688(3). A parking fee of $15 or less per day is not such a fee. ORS 105.672(1)(c).

In its motion for summary judgment, the state asserted that it occupied and operated the day use area that plaintiff had used and that it charged a five-dollar parking fee to park in the area. For the purposes of the motion, the state assumed that either plaintiff or his family paid the fee. The state argued that it was entitled to recreational immunity because it was an "owner" of the land where plaintiff was injured, it "permitted" the public to use the land free of charge for recreational purposes, and plaintiff entered the land for a recreational purpose.

Plaintiff filed a response to the state's summary judgment motion, making two arguments. First, he argued that the state did not "permit" the public to use the lake, because—under both the public trust doctrine and the public use doctrine—the public already had "an absolute right to use—and *recreate* in—the lake."[1] (Emphasis in original.) Second, he argued that, even if the state did "permit" the

---

[1] This court recently described those doctrines in *Kramer v. City of Lake Oswego*, 365 Or 422, 430, 446 P3d 1 (2019), stating:

"In Oregon, two related doctrines create a public right to use certain bodies of water, regardless of who owns the abutting upland. The first applies to bodies of water that are considered navigable as a matter of federal law. Title to the lands underlying those navigable waters passed to the state when Oregon was admitted into the Union, to be 'held in trust for the public uses of navigation and fishery[.]' *Corvallis Sand & Gravel v. Land Board*, 250 Or 319, 334, 439 P2d 575 (1968) (quoting *Winston Bros. Co. v. State Tax Com.*, 156 Or 505, 511, 62 P2d 7 (1936)) \*\*\*; *PPL Montana, LLC v. Montana*, 565 US 576, 591, 132 S Ct 1215, 182 L Ed 2d 77 (2012) (explaining statehood transfer of title to the lands underlying navigable waters). The second doctrine recognizes a public right to use other waterways, even if title to the underlying

public to use the lake, there were questions of fact regarding whether the five-dollar fee was a parking fee or a use fee and that he should be allowed additional time for discovery regarding that issue.

In reply, the state assumed, for the purposes of its summary judgment motion, that the lake was subject to the public trust doctrine, but it disputed that the lake was subject to the public use doctrine. It argued that the doctrines do not grant the public an absolute right to recreate on navigable waterways and do not negate recreational immunity.

The trial court rejected both of plaintiff's arguments and granted the state's motion for summary judgment. It held that the state "directly or indirectly permit[ted]" plaintiff to use the day use area for recreational purposes, noting that the recreational immunity statute does not contain any exceptions for waters that are subject to either the public trust doctrine or the public use doctrine. It also held that plaintiff (or his family) was charged a "parking fee." Based on those holdings, the trial court entered a general judgment dismissing plaintiff's complaint.

Plaintiff appealed. He renewed his argument that the state did not "directly or indirectly permit" the public to use the lake for recreational purposes because the public already had a right to recreate in the lake pursuant to both the public trust doctrine and the public use doctrine. He also argued that the trial court had abused its discretion by denying him additional time for discovery regarding whether the five-dollar fee was a parking fee or a use fee. The Court of Appeals reversed, *McCormick*, 293 Or App at 201, relying on a case that it had issued the same day,

---

land is privately held, as long as the water is 'navigable in a qualified or limited sense.' *Luscher v. Reynolds*, 153 Or 625, 631, 634, 56 P2d 1158 (1936)."

(Internal footnote omitted.) "[F]or either category of waterway, 'the public has the paramount right to the use of the waters.'" *Id*. at 433 (citing *Luscher*, 153 Or at 634-35). The public's right to use the waters includes the right to use the waters for recreation. *Guilliams v. Beaver Lake Club*, 90 Or 13, 28-29, 175 P 437 (1918). However, as this court observed in *Kramer* with respect to the public trust doctrine, the public's right to use the waters "is not absolute." 365 Or at 446. "We have held in the context of the public's right to fish that the state 'in its sovereign capacity in trust for its people' may regulate and even prohibit the public's right to fish in navigable waters of [the] state." *Id*. (citing *Anthony et al. v. Veacth et al.*, 189 Or 462, 474, 220 P2d 493 (1950)).

*Ortega v. Martin*, 293 Or App 180, 427 P3d 1103 (2018). In *Ortega*, the Court of Appeals ruled that

> "a landowner must make a volitional decision to open the land to the public for recreational use in order to 'permit' the recreational use of the land within the meaning of ORS 105.682. That necessarily means that *to 'permit' recreational use within the meaning of the statute, an owner of land must have the authority to make the required volitional decision to allow recreational use.*"

*Id*. at 191 (emphasis added).

Applying *Ortega* in this case, the Court of Appeals held that, because the state had not demonstrated that it had "the authority to decide whether or not to allow the public's recreational use of Lake Billy Chinook," the trial court had erred in granting the state summary judgment. *McCormick*, 293 Or App at 200-01. Given that holding, the Court of Appeals did not reach plaintiff's alternative argument that the trial court had abused its discretion by denying plaintiff additional time for discovery regarding the nature of the five-dollar fee. On the state's petition, we allowed review.

## II.   ANALYSIS

Plaintiff's argument against the state's claim of recreational immunity has two components. First, plaintiff argues that "[a] landowner cannot 'permit' the public to recreate on its property if the public already has a legal right to recreate on the land." Second, plaintiff argues that, under both the public trust doctrine and the public use doctrine, the public already had a right to recreate in Lake Billy Chinook and, therefore, the state could not "permit" the public to recreate in the lake. For the reasons explained below, we reject plaintiff's first argument. Therefore, we do not reach his second.[2]

---

[2] As mentioned, plaintiff asserts that, under the public trust doctrine (which applies to title-navigable waters) and the public use doctrine (which applies to navigable-in-fact waters), the public has an absolute right to recreate in Lake Billy Chinook. For the purposes of its summary judgment motion, the state argued that, even if the lake is subject to the doctrines and even if the doctrines preclude it from banning recreational use of the lake, it was still entitled to recreational immunity. Because we agree with that argument, we do not address whether the lake is subject to either doctrine or whether either doctrine would preclude it from banning recreational use of the lake.

A.   *Statutory Interpretation*

Plaintiff's first argument requires us to inter-
pret the recreational immunity statute, ORS 105.682.
Specifically, it requires us to determine whether an owner
of land can "directly or indirectly permit" use of its land for
recreational purposes if the public already has a right to
use the land for those purposes from another source. When
interpreting a statute, our task is to discern the legislature's
intent. ORS 174.020(1)(a). To do so, we consider the text and
context of the statute, as well as any helpful legislative
history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042
(2009).

1.   *Text*

We begin with the text. In full, ORS 105.682
provides:

"(1)   Except as provided by subsection (2) of this sec-
tion, and subject to the provisions of ORS 105.688,[3] *an
owner of land is not liable in contract or tort for any personal
injury, death or property damage that arises out of the use of
the land for recreational purposes*, gardening, woodcutting
or the harvest of special forest products *when the owner of
land either directly or indirectly permits any person to use
the land for recreational purposes*, gardening, woodcutting
or the harvest of special forest products. The limitation
on liability provided by this section applies if the prin-
cipal purpose for entry upon the land is for recreational
purposes, gardening, woodcutting or the harvest of special
forest products, and is not affected if the injury, death or
damage occurs while the person entering land is engaging
in activities other than the use of the land for recreational
purposes, gardening, woodcutting or the harvest of special
forest products.

"(2)   This section does not limit the liability of an owner
of land for intentional injury or damage to a person coming
onto land for recreational purposes, gardening, woodcut-
ting or the harvest of special forest products."

---

[3]  ORS 105.688, which is set out below, 366 Or at 462-63, describes the lands
to which recreational immunity applies and provides that recreational immunity
is not available if an owner charges for recreational use of its land.

(Emphases added.) Thus, ORS 105.682(1) limits an owner's liability, and ORS 105.682(2) provides that the limit does not apply to liability for intentional injuries.

Under ORS 105.682, an owner is eligible for recreational immunity if it "directly or indirectly permits" recreational use of its land. The dictionary definition of "permit" includes several meanings:

> "**per·mit** *** *vt* **1 :** to consent to expressly or formally **:** grant leave for or the privilege of **:** ALLOW, TOLERATE *** **2 :** to give (a person) leave **:** AUTHORIZE *** **4 :** to make possible ***"

*Webster's Third New Int'l Dictionary* 1683 (unabridged ed 2002) (uppercase and boldface in original). As defined, "permit" can refer to active or passive behavior. It may involve an affirmative grant, or it may involve mere tolerance. It may also involve making an activity or result possible.

Plaintiff argues that, in order to "permit" recreational use of land, an owner must have the authority to prohibit that use. That is one possible understanding of the term "permit," but it does not necessarily follow from the definition of "permit." The definition includes "tolerate," which indicates that an owner can "permit" recreational use of its land even when it cannot prohibit that use. "Tolerate" is defined as follows:

> "**tol·er·ate** *** **2 :** to permit the existence or practice of **:** allow without prohibition or hindrance **:** make no effort to prevent <a legitimate government—that is, one that rests on consent—can ~ an opposition –Lindsay Rogers> **3 :** to endure with forbearance or restraint **:** put up with **:** BEAR <recommends that we should learn to ~ one another *** <~ the offstage egotism and eccentricities of artists –John Mason Brown>"

*Webster's* at 2405 (uppercase and boldface in original). Thus, it is possible that an owner can "permit" recreational use of its land if it "make[s] no effort to prevent" the use or it "put[s] up with" or "bears" the use. *Id.*

The definition of "permit" also includes "make possible," which suggests that an owner can "permit" recreational

use of its land if it makes such use possible as a practical matter, even if the public already has a right to recreate on the land. For example, an owner can "permit" recreational use of its land by providing access to the land or building or maintaining facilities on the land, if those actions make recreational use of the land possible as a practical matter.

That the legislature used the phrase "directly or indirectly" to modify "permit" indicates that it intended that an owner can "permit" recreational use of its land in different ways, any of which would support a claim of recreational immunity. An owner can "directly permit" recreational use if it consents expressly or formally to the use, and it can "indirectly permit" recreational use if it tolerates the use or makes the use possible. The fact that the legislature provided that an owner can "indirectly permit" recreational use of its land indicates that an owner can "permit" recreational use by tolerating it or making it possible, which, in turn, indicates that an owner can "permit" the use even if the public already has a right to recreate on the land. In other words, it suggests that an owner's ability to "permit" recreational use of its land is not contingent upon whether it can prohibit that use. Thus, the plain text of ORS 105.682(1) points toward the conclusion that an owner can "permit" recreational use of its land in a variety of ways, ranging from express consent to mere tolerance, and that it can "permit" that use even if the public already has a right to recreate on the land from another source, such as an easement or the public trust doctrine.

2.   *Context*

The context of ORS 105.682 also supports the view that an owner can "permit" recreational use of its land, even if it lacks the authority to prohibit that use. The context of a statute includes related statutes. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). ORS 105.682 is one of several related statutes governing recreational immunity. ORS 105.672 - 105.696. One of those statutes, ORS 105.676, sets out the policy underlying recreational immunity. It provides:

"The Legislative Assembly hereby declares it is the public policy of the State of Oregon *to encourage owners of land to*

> *make their land available to the public for recreational pur-*
> *poses*, for gardening, for woodcutting and for the harvest
> of special forest products by limiting their liability toward
> persons entering thereon for such purposes and by protect-
> ing their interests in their land from the extinguishment
> of any such interest or the acquisition by the public of any
> right to use or continue the use of such land for recreational
> purposes, gardening, woodcutting or the harvest of special
> forest products."

(Emphasis added.) Thus, the recreational immunity stat-
utes are intended to encourage owners to "make their land
available to the public for recreational purposes." ORS
105.676. That indicates that an owner can "permit" recre-
ational use of its land by making the land "available" for
that use. An owner can do that in a variety of ways. It can
make the land accessible for, or capable of use for, recre-
ational purposes. *Webster's* at 150 (defining "available" to
mean, *inter alia*, "capable of use for the accomplishment of a
purpose *** immediately utilizable" and "that is accessible
or may be obtained"). Or, because "available" is synonymous
with "open," it can simply hold the land open to the public.
*Webster's* at 1579 (defining "open" to mean, *inter alia*, "avail-
able to use *** accessible, suitable, usable") (uppercase
modified). Thus, considering the word "permit" in context
indicates that it includes actions that an owner can take to
facilitate the use of its land for recreational purposes, even
if the public already has a right to recreate on the land from
another source.

　　　　Another one of the recreational immunity stat-
utes, ORS 105.688, provides further support for that view.
It describes the circumstances in which recreational immu-
nity applies, and it indicates that the legislature intended it
to apply broadly. It provides:

"(1)  Except as specifically provided in ORS 105.672 to
105.696, the immunities provided by ORS 105.682 apply to:

"(a)  *All land*, including but not limited to land adjacent
or contiguous to any bodies of water, watercourses or the
ocean shore as defined by ORS 390.605;

"(b)  *All* roads, *bodies of water, watercourses*, rights
of way, buildings, fixtures and structures *on the land
described in paragraph (a)* of this subsection;

> "(c)   All paths, trails, roads, watercourses and other rights of way while being used by a person to reach land for recreational purposes, gardening, woodcutting or the harvest of special forest products, that are on land adjacent to the land that the person intends to use for recreational purposes, gardening, woodcutting or the harvest of special forest products, and that have not been improved, designed or maintained for the specific purpose of providing access for recreational purposes, gardening, woodcutting or the harvest of special forest products; and
>
> "(d)   All machinery or equipment on the land described in paragraph (a) of this subsection."

(Emphases added.) Thus, the legislature has provided that recreational immunity applies on "all land" and all "bodies of water" and "watercourses" on that land. The legislature's use of those terms indicates that it intended recreational immunity to be broadly available, which weighs against plaintiff's argument that the immunity does not apply to land that the public already has a right to use for recreation.

Under plaintiff's argument, recreational immunity would not apply to many lands and waters, including many obvious and important recreational resources. Plaintiff's position is that an owner cannot "permit" recreational use of its land, or the waters on it, if the owner "has no ability to object to or exclude recreational use." Therefore, plaintiff contends, owners cannot "permit" recreational use of lands and waters that are subject to either the public trust doctrine or the public use doctrine. That means, according to plaintiff, that recreational immunity does not apply to any navigable waters in the state, whether publicly or privately owned.

Plaintiff's argument is at odds with the broad language of ORS 105.688. If the legislature had intended to categorically exclude all navigable waters from the protection of the recreational immunity statute, it could have easily done so. It could have provided that recreational immunity applies to "non-navigable bodies of water and watercourses." But it did not. Instead, it provided that recreational immunity applies to "[a]ll land" and "[a]ll *** bodies of water [and] watercourses" on that land. That broad language militates against construing "permit" in a manner that would

categorically exclude navigable waters from the coverage of the recreational immunity statute.

Moreover, the effect of plaintiff's argument would not be limited to navigable waters. As mentioned, plaintiff's argument is that an owner cannot "permit" recreational use of its land if it cannot prohibit that use. Under that argument, recreational immunity would not apply to lands along the ocean that the public has a right to use pursuant to the doctrine of custom, including privately owned lands. *State ex rel Thornton v. Hay*, 254 Or 584, 595, 462 P2d 671 (1969) (holding that, under the doctrine of custom, the public has the right to recreate on the dry-sand area along the Pacific Ocean, up to the vegetation line). In addition, it would not apply to lands subject to dedications for public recreational use, such as lands deeded to governments for use as parks, nature reserves, or scenic sites.[4] Finally, it would not apply to lands, whether publicly or privately owned, that are subject to easements or prescriptions for public recreational use. Owners of such lands could not avail themselves of recreational immunity, even if they expressly invited the public to recreate on their lands. Such significant limitations on the applicability of recreational immunity would be inconsistent with the context of ORS 105.682, and, as we shall explain, its legislative history.

3. *Legislative History*

The legislative history of ORS 105.682 provides further support for the view that an owner can "permit" public recreational use of its land, even if it cannot prohibit such use. ORS 105.682 was enacted in 1995, as part of House Bill (HB) 2296, which repealed and replaced the prior recreational immunity statutes, which had been enacted in 1971. Or Laws 1995, ch 456.[5] As originally drafted, HB 2296

---

[4] For the purposes of the recreational immunity statutes, "'recreational purposes' includes, but is not limited to, outdoor activities such as hunting, fishing, swimming, boating, camping, picnicking, hiking, nature study, outdoor educational activities, waterskiing, winter sports, viewing or enjoying historical, archaeological, scenic or scientific sites or volunteering for any public purpose project." ORS 105.672(5).

[5] As explained by one of its sponsors, Representative Kevin Mannix, HB 2296 consolidated and modified two statutory schemes, one that provided immunity to owners who made their lands available to the public for recreation and

did not expressly provide recreational immunity for public lands, but it was later amended to do so in response to concerns voiced by public landowners. John Brenneman of Idaho Power proposed that HB 2296 be amended to provide that recreational immunity applies to all lands, including public lands. Tape Recording, House Committee on Natural Resources, Subcommittee on Agriculture and Forestry, HB 2296, Jan 30, 1995, Tape 5, Side A (statement of John Brenneman). Brenneman testified that Idaho Power administered public lands, including land along the Snake River where there were three dams that created reservoirs that the public used for recreation, including fishing and boating. *Id*. He explained that the river banks were steep and that there was "inherent danger in that area from recreation." *Id*. He asked the legislators to amend HB 2296 as he had proposed, so that recreational immunity would apply "to all land, not just private, but public as well." *Id*.

Brenneman's amendment was supported by other public landowners. Alan Willis of the Port of Portland testified that the port had properties that were open to the public for recreation, including properties on the banks of Columbia River and Government Island, which is in the Columbia River. Tape Recording, House Committee on Natural Resources, Subcommittee on Agriculture and Forestry, HB 2296, Jan 30, 1995, Tape 4, Side B (statement of Alan Willis). He asked the legislators to apply recreational immunity to ports and other public land. *Id*. Similarly, Ken Armstrong of the Oregon Public Ports Association testified that "ports own a lot of properties, much of which is undeveloped, much of which they provide for the use of their taxpayers to access for fishing purposes or other recreational purposes," and he asserted that "the public landowners ought to be treated the same as the private landowners." Tape Recording, Senate Committee on Water and Land Use, HB 2296, Apr 26, 1995, Tape 127, Side B (statement of Ken Armstrong);

---

another that provided immunity for owners who made their lands available to the public for woodcutting. Tape Recording, House Committee on Natural Resources, Subcommittee on Agriculture and Forestry, HB 2296, Feb 27, 1995, Tape 12, Side A (statement of Rep Kevin Mannix); HB 2296, § 9 (repealing *former* ORS 105.655 - 105.680 (1993) (governing recreational immunity) and *former* ORS 105.685 - 105.687 (1993) (governing woodcutting immunity)); Or Laws 1995, ch 456, § 9.

Tape Recording, House Committee on Natural Resources, Subcommittee on Agriculture and Forestry, HB 2296, Feb 27, 1995, Tape 12, Side A (statement of Ken Armstrong) (noting that, "by its nature," much of the property owned by ports "is waterfront property, which is of some interest from a recreational standpoint"). The legislature approved HB 2296, amended as Brenneman had proposed to provide that recreational immunity applies to all lands, public and private, and all waters on those lands. Or Laws 1995, ch 456, § 4.

That the legislature acted in response to public landowners' concerns about liability arising from public recreation on their properties, including water activities, indicates that the legislature intended recreational immunity to apply to such activities. It also weighs against any suggestion that, when the legislature provided that recreational immunity applies to "[a]ll land" and "[a]ll *** bodies of water [and] watercourses" on that land, it meant to exclude navigable waters, like the Snake River and the Columbia River.[6]

Since 1995, the legislature has amended the recreational immunity statutes in ways that are consistent with the view that an owner can "permit" recreational use of its land, even if the owner lacks the authority to prohibit that use. Those amendments show that that view is consistent with a common understanding of the recreational immunity statute and its purpose. *See Halperin v. Pitts*, 352 Or 482,

---

[6] Given the testimony of Willis and Armstrong, it is likely that legislators had navigable waters in mind. Indeed, when Willis testified, Representative Bill Fisher told him that some of the legislators had toured the Port of Portland and had seen the public recreating in the port's waters. Specifically, Fisher said, "[W]e had a chance to observe some of those public activities taking place on the Port of Portland property and in their waterways. *** I'm glad that I was there and I know a little better about what you're talking about." Tape Recording, House Committee on Natural Resources, Subcommittee on Agriculture and Forestry, HB 2296, Jan 30, 1995, Tape 4, Side B (statement of Rep Bill Fisher).

Representative Mannix later confirmed that HB 2296 was intended to apply broadly. He explained that the bill took the then-existing recreational immunity statutory scheme and woodcutting immunity statutory scheme and "shoved them together and took the broadest possible definition of 'land' and then basically said that the owner is not liable for anything unless there's an intentional injury ***." Tape Recording, House Committee on Natural Resources, Subcommittee on Agriculture and Forestry, HB 2296, Feb 27, 1995, Tape 12, Side A (statement of Rep Kevin Mannix).

490, 287 P3d 1069 (2012) (explaining that, although later-enacted statutes are not context for an earlier-adopted statute, they can demonstrate consistency in word usage over time as indirect evidence of legislative intent).

In 2007, the legislature amended the recreational immunity statutes to ensure that landowners who participated in state programs in which they received payments for allowing the public to use their lands for recreation would be eligible for recreational immunity. Or Laws 2007, ch 372, § 1. The amendment was prompted by concerns voiced by the Oregon Department of Fish and Wildlife (ODFW), which administered two programs designed to improve wildlife habitat and public hunting access on private lands throughout the state. Testimony, House Committee on Agriculture and Natural Resources, HB 2445, Feb 6, 2007, Ex D (statement of Roy Elicker and Ron Anglin). ODFW representatives testified that landowners who participated in the programs received payments "in exchange for public access" to their lands. *Id*. They explained that landowners were concerned that, because they received payments, they might not be protected by the recreational immunity statutes. *Id*. To address those concerns, the legislature amended ORS 105.672(1), which defines terms for the recreational immunity statutes, to provide that "charge" "[d]oes not mean any amount received from a public body in return for granting permission for the public to enter or go upon the owner's land." The amendment shows that the legislature intended recreational immunity to apply to lands that the public already had a right to use as a result of the program participants' agreements with ODFW. In other words, it shows that the legislature understood that the owners could "permit" use of their lands for recreational purposes, even if, under their agreements, they could no longer prohibit that use.

In 2017, the legislature amended the definition of "owner" to include persons, like employees of landowners, who may lack the authority to prohibit the public from using another's land for recreation. Or Laws 2017, ch 449, § 1. It did so in response to this court's decision in *Johnson v. Gibson*, 358 Or 624, 369 P3d 1151 (2016). In *Johnson*, the plaintiff fell after stepping in a hole in a park and brought

an action against the city employee who had dug the hole. This court held that the employee was not entitled to recreational immunity because he was not an "owner" of the land. At the relevant time, "owner" was defined as "the possessor of any interest in any land, including but not limited to possession of a fee title. 'Owner' includes a tenant, lessee, occupant, or other person in possession of the land." ORS 105.672 (2007). Thereafter, the legislature amended the definition of "owner" to include "[a]n officer, employee, volunteer or agent" of the possessor of any interest in any land. Or Laws 2017, ch 449, § 1; ORS 105.672(4)(b). Many counties, cities, and private organizations supported the amendment, informing the legislature that, after *Johnson*, private and public landowners were closing recreational lands and were discouraged from acquiring and developing lands for recreational use. *See generally* Exhibits, House Committee on Judiciary, SB 327, May 9, 2017. Notably, to fix the problem the legislature amended the term "owner." As the amendment shows, the legislature concluded that a person—like the employee in *Johnson*—who may lack the authority to exclude the public from land, can "permit" use of the land for the purposes of the recreational immunity statutes.

To summarize, the legislative history of the 1995 statutes shows that the legislature made recreational immunity applicable to public land and that it did so in response to concerns voiced by public landowners, including landowners whose lands were adjacent to navigable waters, which the public has a right to use for recreation. That, in turn, shows that the legislature did not intend recreational immunity to be contingent upon an owner's authority to prohibit public recreational use of its land. Since 1995, the legislature has continued to act in accordance with that intention, twice amending the recreational immunity statute in ways that provide immunity to persons whose ability to prohibit public recreational use of property is limited.

In arguing against the conclusion that an owner can "permit" public recreational use of land even if it cannot completely prohibit that use, plaintiff relies on the 1971 recreational immunity statutes and their legislative history. As mentioned, those statutes were repealed and replaced by

the 1995 statutes; they are not the same statutes at issue in this case. They provide some historical context for the 1995 statutes, but they do not aid plaintiff. To the contrary, the text of the 1971 recreational immunity statute indicates that the legislature did not intend recreational immunity to be contingent upon an owner's ability to prohibit public recreational use of its land.

The 1971 statutes originated as Senate Bill (SB) 294. Section 3 of the bill provided for recreational immunity. It stated:

"Except as otherwise provided in section 5 of this Act,

"(1)  *An owner of land owes no duty of care to keep the land safe* for entry or use by others for any recreational purpose *or to give any warning* of a dangerous condition, use, structure or activity on the land to persons entering thereon for any such purpose.

"(2)  *An owner of land who either directly or indirectly invites or permits* any person to use the land for any recreational purpose without charge *does not thereby*:

"(a)  Extend any assurance that the land is safe for any purpose;

"(b)  *Confer upon such person the legal status of an invitee or licensee to whom a duty of care is owed*; or

"(c)  *Assume responsibility for or incur liability for any injury*, death or loss to any person or property caused by an act or omission of that person."

SB 294, § 5 (1971) (emphases added). Thus, subsection (1) abrogated certain common-law duties. In doing so, it provided immunity for certain claims. The immunity was not contingent upon any conduct by the owner. It did not depend on whether the owner permitted the recreational use or whether the owner had the authority to prohibit such use. Subsection (2) used the phrase "directly or indirectly permits" but, in context, the purpose of that subsection was to provide that a landowner's conduct could not revive the abrogated duties. Thus, nothing in the text of SB 294 indicates that the immunity it granted was contingent upon an owner's ability to prohibit recreational use of its land.

Other sections of SB 294 limited the immunity it provided. Like the 1995 statutes, the 1971 statutes included exceptions. Section 5 provided that the immunity did not apply if the owner charged for the recreational use of its land or if the owner recklessly failed to warn against a dangerous condition, use, structure, or activity on the land. Notably, it did not include an exception for lands the public already had a right to use for recreation.

In addition, another section of SB 294 suggests that it actually *was* intended to apply to land that the public already had a right to use. Section 7 of SB 294 provided for the repeal of two then-existing statutes governing liability. One had been enacted in 1963 and was a general recreational immunity statute. *Former* ORS 30.790, *repealed by* Or Laws 1971, ch 780, § 7. The other had been enacted in 1967 as part of Oregon's Beach Bill and governed liability of "the owner or person in control of any property subject to a public easement declared a state recreation area [by the Beach Bill] or any property subject to [the Beach Bill's requirements for permits for improvements]" on the ocean shore. *Former* ORS 390.670, *repealed by* Or Laws 1971, ch 780, § 7.

It is significant that SB 294 repealed both *former* ORS 30.790 and *former* ORS 390.670. The repeal indicates that the legislature intended SB 294 to replace those statutes and provide recreational immunity, including for lands subject to the Beach Bill's easements for public recreational use. *See Thornton*, 254 Or at 595 (holding that public's recreational easement over dry-sand area applies to private property). That indicates that the legislature intended the recreational immunity provided by SB 294 to apply to lands that the public already had a right to use for recreational purposes.

Thus, the text and context of SB 294 indicate that the legislature did not intend recreational immunity to be contingent upon an owner's ability to prohibit recreational use of its land.

In arguing otherwise, plaintiff relies on the legislative history of SB 294. That history shows that the 1971

statutes were prompted by the concerns of private land-owners who believed that, unless they took steps to exclude the public from their lands, they could be liable for injuries sustained by persons who came onto their lands for recreational purposes. As one of the bill's sponsors, Senator Lyndel Newbry, explained, the landowners were concerned that, in order to protect themselves from liability, they would have to put up signs or fences to affirmatively exclude the public. Minutes, House Committee on Natural Resources, Subcommittee on Natural Resources, SB 294, Apr 26, 1971 (statement of Sen Lyndel Newbry). Plaintiff relies on that history to argue that the legislature intended recreational immunity to "provide landowners an incentive to open lands for recreational purposes *that otherwise would be closed to the public*." (Emphasis added.)

We agree with plaintiff that the legislature intended recreational immunity to serve as an incentive for land-owners to make their land available for public recreation, but we do not agree that the legislature intended to limit the scope of the immunity as plaintiff contends. First, as just discussed, the text of SB 294 did not include any such limitation. Second, plaintiff's argument that "the recreational immunity statute serves no identifiable purpose for a land-owner who has no authority to allow or disallow recreational use on the land" is incorrect.

Recreational immunity serves as an incentive for owners to hold their land open for recreation, even when the public has a right to recreate on the land. First, and perhaps most importantly, because recreational immunity is contingent upon making land available for recreational use free of charge, it creates an incentive for owners not to charge for recreational use of their land.

Second, it encourages owners to facilitate use of their land by creating access and making improvements, which can make the land available for recreational use, in a practical sense, as is the case with Lake Billy Chinook. There are many things an owner can do to make land available, in the sense of making it accessible. Among them, an owner can provide information about how to reach the land, it can build access roads, and it can construct facilities

that make safe use of the land possible. All of those affirmative actions can make the land available as a practical matter.

Third, recreational immunity creates an incentive for owners not to restrict the recreational use of their land to the greatest extent possible. That the public may have some right to use land does not mean that it has an unlimited right. If recreational immunity is not available to an owner, the owner may choose to limit its risk of liability by providing only as much access as it is required to provide.

Plaintiff argues that recreational immunity cannot serve as an incentive for the state to make lands and waters available for recreation if they are subject to the public trust doctrine. According to plaintiff, "it is not the recreational immunity statute that provides any incentive not to regulate more strictly—it is the public trust doctrine that obligates the state in that regard." We disagree; recreational immunity creates a separate, additional incentive. The public trust doctrine does not provide the public an unfettered right to recreate on navigable waters. First, recreation is not the only use that that doctrine protects, so it is possible that the public's interest in other uses of the water, such as commerce, could enable the state to restrict or even prohibit recreation in some waters. Second, even if the state could not prohibit recreational use, it could restrict it. As this court observed in *Kramer v. City of Lake Oswego*, 365 Or 422, 446, 446 P3d 1 (2019), the public's right to use public trust waters "is not absolute."

Holding, as plaintiff argues, that an owner cannot "permit" recreational use of its land unless the owner can prohibit that use would undermine the purpose of the recreational immunity statutes. It would cause owners to take steps to limit their liability by reducing the availability of their lands for public recreation. The effect would not necessarily be limited to public lands with navigable waters. It could extend to other public lands that the public might claim a right to use for recreation, such as lands dedicated for use as parks. Even if the owners of those lands could not prohibit public recreation on their lands, they could take steps to restrict or discourage the use of their lands. For

example, they could limit the times or areas available for recreation, or they could decline to build or maintain roads or other improvements. They could also choose to charge for the use, because recreational immunity would not be available to serve as an incentive to hold the land open free of charge. In addition, holding that an owner cannot avail itself of recreational immunity could cause governmental entities to decline to accept grants of land that would be dedicated for a public recreational purpose. All of those effects would undermine the legislature's goal of making land available free of charge for public recreation.

### 4.   *Statutory Interpretation Conclusion*

Based on the text, context, and legislative history of ORS 105.682, we conclude that an owner can "directly or indirectly permit" the use of its land for the purposes of the recreational immunity statutes, even if the public already has a right to use the land for that purpose. The quoted phrase itself indicates that the permission can take different forms, which, in turn, indicates that an owner can "permit" recreational use of its property if, among other alternatives, it makes the use possible. That understanding of "permit" is supported by the context of ORS 105.682, specifically, by ORS 105.676, which establishes that the purpose of the recreational immunity statutes is to encourage owners to make their lands "available" for public recreation, which an owner can do by making the land accessible or usable for recreation.[7] It is also supported by the legislative history of the 1995 recreational immunity statutes, which were intended, among other things, to provide recreational immunity for public landowners on whose land and waters (including navigable waters) the public recreated. In addition, it is consistent with the 1971 statutes, which provided recreational immunity that was not contingent upon any conduct by the owner. Finally, it is consistent with the legislature's intent to create an incentive for owners to increase the availability of land for recreation.

---

[7] We need not determine the full range of conduct that can constitute "permitting." It may be that the state "permits" recreational use of the lake simply by tolerating the use or by declining to restrict it as much as possible, but we need not decide those issues to resolve this case.

B.  *Application*

Here, it is undisputed that the state made Lake Billy Chinook accessible for recreation. Among other things, the state developed and maintained day use areas and facilities for recreating in the lake, including facilities for boating and swimming. As plaintiff himself has stated, "the only way to safely access the lake is to use one of the three day use areas." Through its actions, the state "permit[ted]" public recreational use for the purposes of ORS 105.682. Consequently, the Court of Appeals erred in reversing the trial court's judgment on the ground that it did, and we remand this case to the Court of Appeals to address plaintiff's alternative argument, that the trial court erred in denying him additional time for discovery regarding whether the five-dollar fee he paid to enter the park was a charge that precludes application of recreational immunity.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.